Walter D. BALLA, et al., Plaintiffs,

v.

IDAHO STATE BOARD OF CORRECTIONS, et al., Defendants.

Walter D. BALLA, et al., Plaintiffs,

v.

Donald ERICKSON, et al., Defendants. (Two cases).

Civ. Nos. 81–1165, 78–1045 and 1–76–75.

United States District Court, D. Idaho.

Nov. 1, 1984.

Walter D. Balla, pro se.
Dean Schwartzmiller, pro se.

Robert R. Gates, Deputy Atty. Gen., Boise, Idaho, for defendants.

## MEMORANDUM OPINION, FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

RYAN, District Judge.

### Introduction

Each of these actions was brought by Mr. Walter D. Balla, an inmate of the Idaho State Correctional Institution (ISCI), alleging constitutional deprivations taking place at ISCI. Each of these cases was previously consolidated by the Honorable Ray McNichols, District Judge, and a class of persons was certified under Rule 23 of the Federal Rules of Civil Procedure described as "all persons confined at the Idaho Correctional Institution, Main Site, located south of Boise, Idaho, as of May 13, 1981, together with all persons confined there between the period of May 13, 1981, and the entry of final judgment in this case."

Initially, this court had reservations about the ability of the class representative (Inmate Walter Balla) to fairly and adequately protect the interests of the class. By reason of these reservations, the court attempted to procure an attorney or attorneys to represent these pro se litigants. The court was not successful in obtaining attorney representation for the pro se litigants, and perhaps even if an attorney could have been found, it would have resulted in a significant delay in the ultimate resolution of these cases, which cases were crying to be heard and disposed of. The court thereupon, in February 1984, appointed Mr. Dean Schwartzmiller, an inmate at ISCI, as lead lay counsel. Mr. Balla and Mr. Schwartzmiller thereafter shared responsibilities for the presentation of the inmates' cases.

After reading the pleadings in these cases, the court determined that although the pleadings were very rambling and sometimes incoherent, they generally alleged eighth and fourteenth amendment deprivations along with numerous pendent state claims, together with prayers for relief of declaratory judgment, injunction and damages. In order to try these cases, the court was faced with a real management problem, to bring together and cause to be tried a sensible and coherent case where all parties could then have some sense of direction in order to put on their evidence in a somewhat orderly fashion.

After holding a pretrial hearing and status conference at the prison site, the court scheduled the trial to begin on March 5, 1984, and caused the trial to be bifurcated and to deal only and strictly with the requests for declaratory and injunctive relief prayed for by the plaintiffs. The issue of damages, should it be necessary to reach their merits, will be tried separately.

The court ordered that it would not consider any pendent state claims asserted by the plaintiffs.

Further, pursuant to Rule 16(c)(1) of the Federal Rules of Civil Procedure, the court ordered that it would entertain evidence only upon plaintiffs' allegations of constitutional deprivations which relate to their eighth amendment claim of cruel and unusual punishment and their fourteenth amendment claim of denial of due process. Within the ambit of these two alleged constitutional deprivations, there appeared to be a number of disputed factual issues. Among the factually disputed issues relating to cruel and unusual punishment under the eighth amendment claim, the court set them forth in its pretrial order as follows:

(1) whether or not the prison is in fact overcrowded;

(2) whether or not the classification system presently in use is constitutionally defective because it fails to rehabilitate the inmates, debilitates the inmates, and subjects them to physical and sexual assault;

(3) whether or not the classification and disciplinary systems as implemented by the Board of Corrections are constitutionally impermissible;

(4) whether or not the medical care and/or the lack thereof results in deliberate indifference to the serious needs of the inmates; and

(5) whether or not the food services are constitutionally inadequate as part of

the general conditions of confinement.

The due process allegations under the Pretrial Order centered around three factually disputed issues, which are:

(1) whether or not there was a wholesale reclassification of the prison population without notice or an opportunity to be heard, with the attendant argument that such a wholesale reclassification gives rise to due process protections;

(2) whether or not due process rights are afforded and required at individual reclassification hearings; and

(3) whether or not due process of law has been afforded and is required at parole hearings.

The trial ended after thirteen days of testimony. The court established a briefing schedule for submission of post-trial briefs and memoranda. Those memoranda have been received and reviewed and studied by the court. Finally, on June 19, 1984, the court undertook an inspectional tour of ISCI. Included in the tour were the reception and diagnostic unit; the infirmary; the gymnasium, A-Block (medium custody); Housing Unit 9, including Tier C (protective custody) and Tier A (close custody); Housing Unit 7, including Tier A (death row and isolation cell) and Tier C (administrative segregation); Housing Unit 8, including Tier A (detention), Tier B (close custody), and Tier C (close custody); and Housing Unit 10, Tier C (medium custody).

There are three basic classifications of inmates at ISCI. Those classifications are medium custody, close custody, and maximum security. The major classifications represent a risk assessment undertaken by prison officials. Medium custody is composed of those individuals who are the least likely of any of the three categories to attempt an escape or to cause a disruption or violence. The classifications of close custody and maximum security each contain various sub-categories. Within the major classification of close custody, there are inmates in protective custody, detention, and what may be referred to for these purposes as "typical." Protective custody inmates are those isolated from the main yard population for their own safety. Protective custody inmates often have been the subject of homosexual rapes, or owe an unpayable debt to other inmates, and because of these situations have turned evidence about their situation over to prison authorities. Those persons in detention are those who have committed some transgression in violation of institutional rules and are in detention for a period of time as punishment for their violation. The "typical" close custody inmate is in close custody because he is an administrative risk as demonstrated by his prior record, propensity for escape, or his history of disciplinary reports which indicate that he is unfit for activity unless it is closely monitored. Within maximum security there are two sub-categories: administrative segregation and death row. Those inmates in administrative segregation present an even greater threat to institutional security and possibility of flight than do those inmates in close custody.

This suit deals primarily with the main site of ISCI. There are a number of individuals in the minimum security facility located near the main site which is referred to as the "farm dorm." The conditions of confinement at the farm dorm are not properly before this court for determination at this time. However, there are aspects of these cases which specifically overlap with the evidence adduced at trial, and to that extent the minimum security facility is a portion of this litigation. For example, the health care at the main site is the only health care available at ISCI and as such, is used by both inmates at the main site and the farm dorm. Necessarily, the health care relates to the minimum security inmates at the farm dorm. Unless specifically referred to in this opinion, later in the Findings of Fact and/or Conclusions of Law the court speaks only to the main prison site south of Boise, Idaho.

### Scope of Judicial Review

This court believes that the scope of its judicial review has been well defined

by the Ninth Circuit Court of Appeals. In *Hoptowit v. Ray,* 682 F.2d 1237 (9th Cir. 1982), Judge Clifford Wallace stated on behalf of the Ninth Circuit panel:

> In entertaining a cause of action alleging Eighth Amendment violations in a state prison, federal courts must be cognizant of the limitations of federalism and the narrowness of the Eighth Amendment. Federal courts lack the power to interfere with decisions made by state prison officials, absent constitutional violations. Courts must recognize that the authority to make policy choices concerning prisons is not a proper judicial function. *Bell v. Wolfish,* 441 U.S. 520, 562, 99 S.Ct. 1861, 1886, 60 L.Ed.2d 447 (1979). Any needed prison reform is an executive and legislative responsibility. The function of a court is limited to determining whether a constitutional violation has occurred, *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 2400–01, 69 L.Ed.2d 59 (1981), and to fashioning a remedy that does no more and no less than correct that particular constitutional violation. *See Swann v. Charlotte-Mecklenburg Bd. of Educ., supra,* 402 U.S. [1] at 16, 91 S.Ct. [1267] at 1276 [28 L.Ed.2d 554 (1971)].

The Eighth Amendment is not a basis for broad prison reform. It requires neither that prisons be comfortable nor that they provide every amenity that one might find desirable. *Rhodes v. Chapman, supra,* 101 S.Ct. at 2400; *Wolfish v. Levi,* 573 F.2d 118, 125 (2d Cir.1978), *rev'd on other grounds sub nom., Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Rather, the Eighth Amendment proscribes the "unnecessary and wanton infliction of pain," which includes those sanctions that are "so totally without penological justification that it results in the gratuitous infliction of suffering." *Gregg v. Georgia,* 428 U.S. 153, 173, 183, 96 S.Ct. 2909, 2925, 2929, 49 L.Ed.2d 859 (1976). *See also Rhodes v. Chapman, supra,* 101 S.Ct. at 2399. This includes not only physical torture, but any punishment incompatible with "the evolving standards of decency that mark the progress of a maturing socie-

ty." *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958). *See also Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). In determining whether a challenged condition violates "evolving standards of decency," courts may consider opinions of experts and pertinent organizations. But these opinions will not ordinarily establish constitutional minima. What experts may consider desirable may well constitute appropriate goals to which the other branches may aspire but they do not usually establish those minimums below which the Constitution establishes a prohibition. *See Rhodes v. Chapman, supra,* 101 S.Ct. at 2400 n. 13. Indeed, they weigh less heavily in this determination than what the general public would consider decent. *Id.*

D. *Analytical Framework.*

In analyzing claims of Eighth Amendment violations, the courts must look at discrete areas of basic human needs. As we have recently held, " '[A]n institution's obligation under the eighth amendment is at an end if it furnishes sentenced prisoners with adequate food, clothing, shelter, sanitation, medical care, and personal safety.' " *Wright v. Rushen,* 642 F.2d 1129, 1132–33 (9th Cir.1981) (*Wright*), *quoting Wolfish v. Levi, supra,* 573 F.2d at 125.

In assessing claims of Eighth Amendment violations, and equally importantly, in tailoring a proper remedy, we must analyze each claimed violation in light of these requirements. Courts may not find Eighth Amendment violations based on the "totality of conditions" at a prison. *Wright,* 642 F.2d at 1132 .... There is no Eighth Amendment violation if each of these basic needs is separately met. If a challenged condition does not deprive inmates of one of the basic Eighth Amendment requirements, it is immune from Eighth Amendment attack. A number of conditions, each of which satisfy Eighth Amendment requirements, cannot in combination amount to an Eighth Amendment violation.

As we have said, however, "[E]ach condition of confinement does not exist in isolation; the court must consider the effect of each condition in the context of the prison environment, especially when the ill-effects of particular conditions are exacerbated by other related conditions." *Id.* at 1133. This is no more than a recognition that a particular violation may be the result of several contributing factors. "But the court's principal focus must be on specific conditions of confinement. It may not use the totality of all conditions to justify federal intervention requiring remedies more extensive than are required to correct Eighth Amendment violations." *Id.* To find an Eighth Amendment violation, courts must identify specific conditions that fail to meet Eighth Amendment requirements. We cannot rely on a vague conclusion that the "totality of conditions" violates the Eighth Amendment.

*Wright* is also critical to the determination of an appropriate remedy. Arguably, under the "totality of conditions" approach, courts may be justified in ordering broad remedies to correct all the conditions that combine to create the "violation." Under our approach, only the specific conditions that violate the Constitution may be remedied, and the remedy may be only so much as is required to correct the specific violation. A remedy may go beyond this only when there is a record of past constitutional violations and violations of past court orders. *See Hutto v. Finney,* 437 U.S. 678, 687, 98 S.Ct. 2565, 2571, 57 L.Ed.2d 522 (1978).

In ordering a remedy, courts must consider the cost of compliance and the effect on legitimate security needs of the prison. *Wright,* 642 F.2d at 1134. Courts should consider bona fide steps that prison officials are taking to alleviate poor prison conditions. This is not to say that such steps necessarily obviate the need for a remedy. Rather, the court should defer to the policy choices made by prison officials and order a remedy consistent with the basic approach taken by prison officials, unless that approach itself is inconsistent with the

Eighth Amendment. *See Bell v. Wolfish, supra,* 441 U.S. at 562, 99 S.Ct. at 1886.

*Id.* at 1246–47 (footnote omitted).

In the area of overcrowding and idleness, there was much testimony and complaints of debilitation and a cry for programs of rehabilitation. Rehabilitation and the returning of inmates to society as useful and responsible citizens is, of course, a laudable and correct and worthwhile goal. However, rehabilitation is not constitutionally required. Such commendable goals would certainly be encouraged by this court, but are better left to the Idaho State Legislature and executive policy. The problems at ISCI and of prisons in America are complex and intractable, and more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of state government. Courts are ill-equipped to deal with the increasing urgent problems of prison administration and reform. This court's recognition of that fact reflects no more than a healthy sense of realism.

## FINDINGS OF FACT

### Food

1. Prior to trial there was a disparity between the quantity and quality of food being served those prisoners in medium custody and those prisoners in either maximum security or close custody. Those inmates in medium custody were being served at Pendyne, the cafeteria facility. Those inmates in close custody and maximum security were being served on the tiers where their cells are located. Food portions for inmates in close and maximum were being meted out and placed on individual trays at the Pendyne facility, and then transported via an automated cart to the individual housing units. Those housing units are some distance away and an almost universal complaint was that if the food was meant to be served hot, it was either lukewarm or cold, and that if it was

intended to be served cold or frozen, it was lukewarm or melted when it was served.

2. There was evidence that the quantity of food served to those inmates in close custody and maximum security was significantly less than that served to inmates in medium custody at Pendyne. This evidence was corroborated by defendants' own witness Agnes Foley, a registered dietitian for the Idaho Department of Health and Welfare. Ms. Foley conducted tests on representative samples from the main line at Pendyne and compared it with a portion destined for close custody. In analyzing the two different portions, Ms. Foley determined that the portion of food served at the main line of Pendyne, excluding the salad bar which she was unable to assess since there was no readily identifiable quantity, amounted to 2,812 calories. Defendants' Exhibit No. 332. On the other hand, the representative sample for those inmates in close custody or maximum security amounted to 1,606 calories. Defendants' Exhibit No. 332. In other words, defendants' own witness testified that persons in medium custody were receiving nearly half again as much food as those inmates in close custody or maximum security. The calculations of Ms. Foley increased to 3,475 calories for medium custody inmates and 2,297 calories for inmates in close custody or maximum security when planned beverages were included. It was Ms. Foley's conclusion that while there was a significant disparity between the caloric content of the food received by medium custody inmates and those in either close custody or maximum security, that both quantities were within the recommended dietary allowances of the American Dietetic Association.

3. Regardless of what the situation was prior to and during trial, the court has learned that prison officials have dramatically altered the food service to maximum security and close custody inmates in the intervening months between the conclusion of the trial and the writing of this opinion. Presently, the administration at ISCI has implemented a program whereby the foods destined for close custody and maximum security are transported in bulk to the individual housing units and served at that point. The result is that inmates in close custody and maximum security receive a better quality and larger quantity of food. As a result of the implementation of this method of dispensing food, the representative of the class, Mr. Balla, has informed the court that the problems associated with food have been alleviated.

4. There remain problems with specific diets of particular inmates. Inmates John McGonnigal and Donald Kerst, both of whom suffer from diabetes, testified that they had experienced difficulties in receiving appropriate diets. In Mr. McGonnigal's case, he was unable to procure enough food to supplement his caloric intake for his medical condition. In Mr. Kerst's instance, he was prescribed a high protein diet, limited to 1,800 calories, to be coordinated with his injections of insulin. In Mr. McGonnigal's case, he collapsed after going to Pendyne and receiving a juice which was artificially sweetened with saccharine. In Mr. Kerst's case, he is now legally blind, suffering from diabetic retinopathy, because of his inability to control his diabetic condition.

5. Inmate Kenneth Volker suffers from Crohn's Disease. As a result of that disease, he is supposed to limit his diet to low residue, low fat, low starch, and low grease food products. In an effort to accommodate Mr. Volker's diet, Physician's Assistant Stedfeldt authorized a double serving for Inmate Volker at the Pendyne cafeteria. After some three months on this "diet," Inmate Volker suffered a relapse which resulted in his hospitalization.

6. The court finds that the problems regarding the disparity between quality and quantity of food being served to inmates in medium custody and those in maximum security and close custody has been alleviated and is now moot. However, the officials at ISCI have been reluctant to accommodate inmates with regard to diets needed for specific health and dietary problems.

*Clothing*

7. The clothing worn by inmates in medium custody and close custody was of good quality cotton and appeared adequate for the conditions in which it was being worn.

8. The clothing being worn by inmates in protective custody is lightweight cotton uniforms which were previously owned by Hughes Airwest Company. The multi-colored (yellow and blue) uniforms do an adequate job of setting those inmates in protective custody apart from other custody levels, but insofar as warmth is concerned, they are inadequate. These lightweight uniforms, many of which were ripped up the seams to approximately knee level, did not afford sufficient warmth for the temperature of the courtroom on the days of trial, much less would they provide adequate warmth in a prison environment. It was noted by the court during its visitation at ISCI, that the protective custody inmates, at least while confined to the unit, appeared to be wearing all manner of different clothing, including sweatsuits and other civilian apparel.

*Health Care Delivery System*

*Medical Care:*

9. In 1979, the Idaho Department of Corrections commissioned a study to develop a comprehensive master plan to analyze the existing facilities and develop a course of action for the future. The group commissioned to produce the master plan published their findings in April 1982. *See* Plaintiffs' Exibit No. 3A. With regard to the medical facility at ISCI, the commission had the following findings:

Inadequate Medical Facility

The current health care delivery system is not adequate according to a recently completed report by the Idaho Medical Association. The Psychiatric Unit of ISMF [Idaho Security Medical Facility] does not currently meet National Institute of Corrections, American Correctional Association and Idaho Health and Welfare Standards regarding: (1) physical standards on room size; (2) number of available beds; (3) psychi-

atric services; (4) number of therapy technicians; (5) occupational therapy services; and (6) number of fully equipped observational rooms.

Medical care does not meet American Correctional Association, National Institute of Corrections and Idaho Medical Association Standards regarding: (1) number of medical staff; (2) dental services; (3) bed space; and (4) support staff.

Idaho Department of Corrections, Master Plan, April 1982 at 51.

10. ISCI does not employ any full-time medical doctors. Medical doctors do, however, travel to the infirmary on a twice-weekly (Tuesday and Friday) basis for approximately four hours on each day.

11. The medical staff at ISCI consists of Mr. Hal Gaythwaite, medical services manager; Mr. Steven Stedfeldt, a licensed physician's assistant; and Mr. Doug Barlow, a registered nurse and licensed nurse practitioner. Medical services are provided in large part by these three individuals. These three examine patients, refer patients to physicians, diagnose illnesses, suture cuts, and cast broken limbs. The medical staff is only available sixteen hours per day, seven days per week. Accordingly, emergency medical care is unavailable one-third of the time. Director of Corrections Al Murphy testified that he is attempting to resolve this problem; however, as yet this inadequacy has not been alleviated.

12. Medical care is accessible only via a "kite" system. A "kite" is a medical request form submitted by an inmate which explains the problem being experienced by the inmate and which initiates medical review by the medical staff. *See* Plaintiff's Exhibit No. 172. The kite system leaves a great deal to be desired. Evidence was produced which indicated that kites had been submitted by inmates and never responded to by the medical staff. The American Correctional Association, in its standards for adult correctional institutions, deems it mandatory that "[w]ritten policy and procedure provide for unimped-

ed access to health care and for a system for processing complaints regarding health care." American Correctional Association Standards for Adult Correctional Institutions, 2d Ed. § 2–4300 at 79 (1981). A system which does not respond to written requests for medical attention cannot possibly be construed as affording access to nor being responsive to complaints about the health care system. Moreover, the kite system, even when working properly, can result in a significant delay between the time the inmate submits his kite and the time he is seen by a member of the medical staff.

13. Perhaps even more telling is the fact that access to the infirmary is impossible without an individual guard's permission. Plaintiffs demonstrated that the kite system, on occasion, breaks down entirely, thus preventing inmate access to the infirmary. The infirmary itself is locked at all times. Presumably this is for security reasons. The medical services director, Hal Gaythwaite, refused to defend that policy when testifying. Not only is the infirmary locked at all times, it is frequently impossible to gain admission. Shortly prior to trial, court staff toured the prison, and when the court toured the ISCI medical facility, no inmates were being cared for in the infirmary. While it may be that these two instances were rare occurrences, it certainly corroborates plaintiffs' allegations that admission to the infirmary is functionally deficient, cumbersome, or impossible. The infirmary itself seemed to be entirely adequate for the functions for which it is designed. Nonetheless, the court was left with the unmistakable impression that it is difficult, and cumbersome, for an inmate to gain access to this facility.

14. There are major problems existing at ISCI relating to medical care. There is no full-time medical doctor or doctors on staff to oversee and minister to the medical needs of in excess of eleven hundred inmates. (The medical facility is intended to provide interim medical care for not only the main yard, but those inmates at the farm dorm.) The medical staff, such as it is, is forced to provide medical care which it is neither trained nor licensed to provide.

Moreover, this meager staff is only available sixteen hours per day, leaving the inmates at ISCI without any emergency medical care for a critical period of time. In addition, it is clear that certain inmates have been unable to procure an initial consultation with a member of the medical staff because of a breakdown in the kite system. Most importantly, there is no written procedure which provides guidance to the medical staff personnel or security staff in dealing with either emergency or day-to-day operations of the medical facility.

15. The medical delivery system at ISCI is very minimal and meager at best. There was evidence that after some time delay, serious medical problems were taken to Boise medical facilities and upon arrival, the inmate then received adequate medical attention. There was also evidence that follow-up medical attention, medical prescription, and dietary prescribed needs in numerous instances received deliberate indifference.

16. There was also uncontroverted evidence of inmates' ailments being misdiagnosed by the meager medical staff at ISCI, and there were instances of which serious delay resulted by reason of such misdiagnosed cases that resulted in delayed medical care and/or a resulting poor prognosis of the injury or ailment. In some instances, only by reason of an inmate's ability to contact his family or friends was outside pressure brought to bear on the institution. The institution was then forced to overcome its deliberate indifference and provide proper medical treatment.

17. There was little or no evidence submitted in this case on the question of the proper or adequate keeping of medical records. Considering that the plaintiff's case was presented by lay counsel, this is understandable. However, what few medical records are in evidence, although they are certainly not comprehensive or complete, they appear to leave a great deal to be desired.

18. After reviewing the evidence relating to the medical care delivery system at

ISCI, this court finds that it is marked by an absence of any organizational structure, plan or written procedures. There is inadequate instruction, supervision and review of the personnel putatively providing medical care. The medical delivery system at ISCI is a system that persistently and predictably fails to provide adequately for the legitimate medical needs of the prison population. This health delivery system at ISCI, for a number of years up to the present, has been handled with considerable deliberate indifference.

19. An inmate incarcerated at ISCI must of necessity rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. There was considerable evidence in this case that by reason of the deliberate indifference and failure to deliver medical care, in many instances it produced unneeded, unnecessary and inexcusable torment, pain, suffering, and anxiety. In the less serious cases of denial of medical care, it appeared to and did result in pain and suffering which this court, or anyone else for that matter, would suggest that it serves any penological purpose. The infliction of unnecessary suffering and the meeting of basic medical care is inconsistent with contemporary standards of decency. The defendant has a duty to care for and provide a medical delivery system to the inmate who cannot by reason of the deprivation of his liberty care for himself. This deliberate indifference to serious medical needs of prisoners constitutes an unnecessary and wanton infliction of pain proscribed by the eighth amendment. The indifference manifested by the medical delivery system with untrained, unlicensed and inadequate personnel, or by prison guards in intentionally denying or negligently delaying access to medical care, or intentionally or negligently interfering with the treatment once it has been prescribed, is not compatible with the standards of decency required of a maturing society.

*Psychiatric Care:*

20. From the evidence heard by this court, psychiatric care provided at ISCI is even far more deficient than the medical care delivery system. Psychiatric care at ISCI is almost nonexistent. While it is true that the Department of Corrections employs two full-time psychologists, the attitude of the Department with regard to psychiatric care can best be described as deliberately indifferent.

21. It appears from the evidence that little or no screening or testing occurs when an inmate enters the institution. No adequate attempt is made to identify mental problems or psychological maladies. The approach for diagnosing drug dependencies, alcohol problems, or other substance abuse related problems is haphazard. Apparently the chosen course of action is to prescribe psychotropic medication in lieu of psychiatric counseling. In the three-year period from 1981 to 1983, the prescription and attendant use of psychotropic medication has more than quintupled when considering the number of inmates actually taking psychotropic medication. A court requested memorandum was provided to the court subsequent to the completion of testimony. That memorandum documented an alarming increase in psychotropic medication. The figures in that memorandum are:

### Average Monthly Population

| 1981 | 1982 | 1983 |
|------|------|------|
| 753 | 849 | 923 |

### Average Percent of Inmates on Psychotropic Medications

| 1981 | 1982 | 1983 |
|------|------|------|
| 2% | 5% | 9% |

In relative terms, the percentage of inmates receiving psychotropic medication has increased at an extraordinary rate of four and one-half times in just three years. When the absolute increase is considered (taking into account the fact that the prison population increased by approximately 13 percent in 1982 and 9 percent in 1983), the number of inmates taking psychotropic

medication has increased approximately five and one-half times in the course of three years.

22. The abdication of responsibility for psychiatric care and counseling is manifested in a number of ways. Numerous young men testified to brutal physical beatings and violent gang rapes which were reported to authorities, which accomplished some minimal goals for the victim of perhaps a change in living quarters, being given inmate protection, or placed in protective custody. A cold indifference was apparent on the part of the Department of Corrections in providing to the victim any psychiatric counseling. There was further evidence of inmates who had attempted suicide who obviously were manifesting severe mental and emotional problems. Little or no psychiatric care or assistance was or is provided to these seriously ill people.

23. The Idaho State Legislature, in enacting Idaho Code § 20–223, precludes the release on parole of even a model prisoner serving a sentence for the crimes enumerated in that section, or whose history and conduct indicate that such inmate is a sexually dangerous person except upon the examination and evaluation of one or more psychiatrists or psychologists. This statutory scheme requires indeterminate incarceration of sex offenders absent rehabilitation. Thus, having chosen to incarcerate inmates categorized as sexually dangerous persons because of their mental illness, the State of Idaho has determined that it no longer has an interest in punishing the inmate, but rather in attempting to rehabilitate such categorized inmate. This rehabilitative rationale is not only desirable, but it is constitutionally required. *Ohlinger v. Watson*, 652 F.2d 775 (9th Cir.1980). The Idaho Code § 20–223 inmates are perhaps not crying out for the best possible treatment, nor are they seeming to demand a guarantee to be cured of their mental incapacity or inadequacies. They are, however, entitled to a treatment program that will address their particular needs, with the reasonable objective of evaluation and rehabilitation, to have some history or reasonable basis worked up during their incarceration whereby a psychiatrist or psychol-ogist could then give a reasonable evaluation or opinion to the parole commission indicating whether or not such sexually dangerous person is fit to return to society. Such constitutionally required treatment is not that which must be provided to the general prison population, but rather, that which must be provided to those committed under any of the categories set forth in Idaho Code § 20–223. Certainly due process requires that the nature and duration of commitment bears some reasonable relation to the purpose for which the individual is committed. In these cases, adequate and effective treatment is constitutionally required, for absent such treatment, a Section 20–223 categorized individual inmate could be held indefinitely.

### Personal Safety

24. Another area of grave concern for this court is that of personal safety. Because the level of violence and, hence, personal safety depends largely on the various custody levels, the court will analyze each of the custody levels separately.

### Medium Custody:

25. Medium custody is the least restrictive custody designation at the main site. Medium custody inmates are housed in A-Block, Housing Unit 10, and Housing Unit 11. Medium custody inmates are those inmates deemed less likely to escape, better able to deal with personal interaction in prison, and more capable of holding down a prison industries job than either those inmates in close custody or maximum security. Presently Housing Units 10 and 11 are double-bunked and double-housed. The cells are approximately 60 square feet each. While most of the units have two persons each, those inmates in medium enjoy a greater degree of flexibility than do those inmates in either close custody or administrative segregation. Inmates in medium custody are confined to their cells from 9:00 p.m. until 8:00 a.m. (although the doors are not locked and inmates continue to have access to restroom facilities), but at times other than this, inmates have freedom to roam the tier, which includes the

hallway and day room. Moreover, many of those inmates in medium custody have a job of some sort which occupies a certain portion of their day. Those inmates in medium custody also have access to the yard areas which include the gymnasium and ball fields for approximately five and one-half hours each day from 1:00 p.m. until 3:30 p.m. and again from 6:00 p.m. until 9:00 p.m. Since most of the inmates in medium custody have jobs during the day, they are unable to utilize either the gymnasium or ball fields from 1:00 p.m. until 3:30 p.m.

26. While the degree of personal safety in medium custody Housing Units 10 and 11 is higher than that in close custody, testimony indicated that there had been a number of acts of violence, including stabbings, assaults on officers and inmates, a gang rape which occurred as a direct result of a guard's inadvertent placement of an inmate on the wrong tier as a result of instructions given him by other inmates, and acts of sexual slavery which were finally ended after a correctional specialist at the institution asked an inmate to afford protection for two of the inmates being assaulted. Currently, there are approximately one hundred forty inmates in each of Housing Units 10 and 11. Inmates in these units must face the distinct possibility of assaults and/or sexual rape at the hands of other inmates. There is one guard per shift for each housing unit.

*Close Custody:*

27. Close custody is the custody level between medium custody and maximum security. Those inmates in close custody represent a higher security risk of either escape or antisocial behavior than do those in medium custody and a lesser degree of those two possibilities than maximum security. Those inmates in close custody are relegated to that custody level because their sentence is such that they will not be released in the near future or because they have received disciplinary report(s) and are unable to conform their behavior to acceptable standards. Prior to trial, inmates in close custody were allowed to roam the tiers and day rooms for the better part of the day (from approximately 7:00 a.m. until 9:00 p.m.). This open tier policy, coupled with the makeup of close custody inmates, resulted in a high level of violence and, in the words of the director of the Department of Corrections, an extraordinarily high level of sexual assaults. Since the trial, corrections officials have attempted to alleviate the high level of violence in close custody. Their goal is to single-cell those inmates in close custody and to significantly curtail the open tier policy which resulted in such high levels of violence.

28. The present policy in close custody is likewise to house the inmates from 9:00 p.m. until 7:00 a.m. in their cells. At approximately 7:00 a.m., inmates in close custody are allowed out of their cells for breakfast. At approximately 9:00 a.m., the inmates have the option of either returning to their cells or spending an hour in the day room (the day room is approximately 24 feet by 33 feet). On the hour, prisoners have the option of moving back and forth between the day room and their cells, but once a ten-minute period on the hour is over, they must either be in their cells or in the day room. Mingling on the tier is allowed during the lunch and dinner breaks and for a two-hour period in the afternoon, but the open tier, which evidently engendered the dramatic levels of violence and sexual assault, is presently a thing of the past. Inmates in close custody are allowed to go to the gymnasium for a two-hour period twice weekly. Every other day they are allowed a two-hour period on the ball field, weather permitting.

*Protective Custody*

29. Protective custody is the classification level designed to segregate those inmates subject to sexual assault, or extortion, or who are unable to pay debts to inmates in the prison population at large, and who have provided that information to prison officials. Prisoners in protective custody are subject to the same limitations on mobility as those inmates in close custody, but do not enjoy the single-celling which is currently being implemented in close custody. In addition, those inmates in protective custody are only allowed one

and one-half hours per week in the gymnasium. Consequently, those inmates in protective custody suffer under some of the most oppressive conditions at the prison apparently for no other reason than they are young and vulnerable and cannot protect themselves. Nor do they enjoy complete security in protective custody. At least two inmates have been raped in protective custody, and the court learned from touring the institution that inmates who are not supposed to be in protective custody sometimes achieve access nonetheless.

*Maximum Security:*

30. Maximum security is comprised of death row inmates and administrative segregation inmates. These two groups are housed in Housing Unit 7. Administrative segregation is composed of those individuals who are the most difficult to deal with from an institutional standpoint. Inmates in administrative segregation enjoy few of the privileges of inmates in either medium or close custody. Inmates in administrative segregation are only allowed outside their cells one hour per day. This hour can be spent in an exercise pen on the tiers of Unit 7, or if the weather permits, in an outside exercise enclosure. Inmates in administrative segregation are not allowed to be in the same cell or exercise area with another inmate. Notwithstanding this apparent isolation, acts of violence have occurred in administrative segregation.

### Classification

31. Classification is another area that underwent radical changes during the prosecution of this trial. Prior to trial, few, if any, of the guidelines for or determinations by the classifications committee were in writing. All incoming inmates were placed in close custody, and depending upon their behavior, were moved or were left on that custody level. The result of this policy was the brutal gang rape of many young men at ISCI.

32. Prior to the policy of placing all inmates in close custody was a system which was referred to as a "fish" tier. A "fish," in prison parlance, is a young, vulnerable, unprotected inmate. The fish tier was comprised entirely of these young, vulnerable inmates. The fish tier evidently afforded a short period of personal safety for the younger inmates, but that safety was shortlived because once the tier was filled to capacity, the fish who had been on the tier the longest were forced out when a new fish arrived. It is difficult to determine which system is more barbarous— that which placed the fish into close custody immediately, or that which gave them a brief period of respite before forcing them into the general population. At any rate, during the trial, the practice of placing fish into close custody at the earliest opportunity was modified by Warden Arvon Arave at a staff meeting. The minutes from that meeting read: "Any inmates from intake being transferred to the yard should go to 9 house [close custody] unless they are really a 'fish.'" Minutes from Warden's Staff Meeting, March 12, 1984, Plaintiffs' Exhibit No. 164.

33. Presently the system of classification as written is more objective. This system has a primary foundation of risk assessment. In adopting this new system, the prison officials have attempted to quantify their classification procedures in an effort to inject predictability and guidelines, not only for the classification committee, but for the prisoners themselves. The only problem with the new initial classification system designed by prison officials is that it may not adequately protect those individuals subject to predatory sexual assaults.

### Wholesale Reclassification of the Inmate Population in April 1981

34. In April 1981, prison administrators implemented an entirely new classification system. At that time, wholesale reclassification occurred. The classification system developed at that time was in specific response to a riot which occurred in 1980. Various studies were conducted which analyzed the causes of the riot and attempted to effect solutions. Neither notice nor opportunity to be heard was afforded to inmates subject to the wholesale reclassifica-

tion. However, it should also be noted that the classification system has been radically altered since the time of the reclassification in 1981, and that as a result, the classification system presently employed at ISCI not only bears little resemblance to the previous classification, but also there are no remnants of the previous wholesale reclassification in existence. In the latter part of 1981, representatives of the inmates and prison administration entered into a settlement decree whereby the records relating to the wholesale reclassification were expunged from the inmates' institutional records and all of the inmates classified as close custody were reclassified to medium custody. *See* Plaintiffs' Exhibit No. 37.

### Due Process Requirements for Parole Hearings

35. The requirements for due process at parole hearings are governed by the unique structure and language of each state's pertinent statute. *See Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), and *Connecticut Board of Pardons v. Dumschat,* 452 U.S. 458, 101 S.Ct. 2460, 69 L.Ed.2d 158 (1981). The Idaho Parole Board is governed by Idaho Code § 20–223 (Supp.1983). Idaho Code § 20–223 reads in pertinent part:

The commission shall have the power to establish rules, regulations, policies or procedures in compliance with chapter 52, title 67, Idaho Code, under which any prisoner, excepting any under sentence of death, may be allowed to go upon parole.

. . . .

Before considering the parole of any prisoner, the commission shall afford the prisoner the opportunity to be interviewed. A parole shall be ordered only for the best interests of society, not as a reward of clemency and it shall not be considered to be a reduction of sentence or a pardon. A prisoner shall be placed on parole only when arrangements have been made for his employment or maintenance and care, and when the commission believes the prisoner is able and willing to fulfill the obligations of a law-abiding citizen. The commission may also by its rules, regulations, policies or procedures fix the times and conditions under which any application denied may be reconsidered.

36. Ralph Pierce, Executive Secretary of the Idaho Commission for Pardons and Paroles, testified at trial that the Idaho Commission for Pardons and Paroles does not comply with the requirements of the Idaho Administrative Procedures Act (Act). Idaho Code §§ 67–5201–218 (1980). However, Idaho Code § 67–5201(1) (Supp.1983) specifically excludes the "state board of corrections" from the statutory definition of an "agency" for purposes of the Act. Plaintiffs maintain, notwithstanding this specific exclusion, that the initial sentence of the parole statute [Idaho Code § 20–223 (Supp.1983)] requires the Commission for Pardons and Paroles to follow the requirements of the Act.

37. Mr. Pierce also testified that the Commission for Pardons and Paroles does not provide good time credits to prisoners who are incarcerated pursuant to Idaho Code § 20–223 (Supp.1983). That statute further provides:

[N]o person serving a life sentence or serving a term of thirty (30) or more years shall be eligible for release on parole until he has served at least ten (10) years and no person serving a lesser sentence for any of the following crimes; homicide in any degree, treason, rape by force or threat of bodily harm, incest, crime against nature, committing a lewd act upon a child, robbery of any kind, kidnapping, burglary when armed with a dangerous weapon, or with [sic] an attempt or assault with intent to commit any of said crimes, or as an habitual offender, shall be eligible for release on parole until said person has served a period of five (5) years or one-third (⅓) of the sentence, whichever is the least.

Plaintiffs contend that Section 20–101A (1979) is not being applied by the Commission for Pardons and Paroles. Section 20–101A reads in pertinent part:

Good conduct reduction of sentences.—Each person convicted of an offense against the state and confined in a penal or correctional institution for a definite term other than for life, whose record of conduct shows that he has faithfully observed all the rules and has not been subject to punishment, is entitled to a deduction from the term of his sentence beginning with the day on which the sentence starts to run as follows:

(1) Five (5) days for each month, if the sentence is not less than six (6) months and not more than one (1) year.

(2) Six (6) days for each month, if the sentence is more than one (1) year and less than three (3) years.

(3) Seven (7) days for each month, if the sentence is not less than three (3) years and less than five (5) years.

(4) Eight (8) days for each month if the sentence is not less than five (5) years and less than ten (10) years.

(5) Ten (10) days for each month, if the sentence is ten (10) years or more.

Given the language of Idaho Code § 20–223 and § 20–101A, there is an obvious conflict between these two statutes. Idaho Code § 20–223 requires an inmate to serve a certain minimum sentence before being eligible for parole. Idaho Code § 20–101A, on the other hand, mandates that an inmate receive a good conduct reduction in his sentence irrespective of whatever sentence he is serving under Idaho Code § 20–223. Perhaps this statutory conflict has not been brought into focus by the Idaho State Legislature. This is a matter for resolution by the State Legislature where it rightfully belongs. Such a policy matter is not within the province of this court.

### Due Process Requirements for Disciplinary Hearings

38. At ISCI inmates charged with major rules infractions are routinely segregated prior to the disposition of the disciplinary hearing. As a result of this pre-hearing detention, the inmate has little opportunity to collect evidence which may be favorable to his position. Moreover, when inmates are assigned an inmate lay-representative, those representatives have only a few minutes within which to prepare for the representation of the accused.

39. Disciplinary hearing officers testified at trial and were conversant in the basic requirements of due process as set down by the United States Supreme Court in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). While plaintiffs attempted to demonstrate that persons accused of disciplinary infractions were systematically denied the opportunity to present witnesses, this court is unable from the evidence presented to concur in plaintiffs' assessment. The evidence presented was simply insufficient to support such a far-reaching conclusion.

### Overcrowding and Staffing

40. There seems to be little question but that ISCI is overcrowded. This overcrowding clearly brings on many problems, including idleness, frustration, stress, discomfort, edginess, and fear. This, of course, does not require much imagination to realize that it is one of the principal causes of the effect of violence, fights, stabbings, and of course, extreme management problems. It is easy to see that by reason of this overcrowding the management problems are compounded by a lack of staffing, or at least understaffing. This understaffing, along with the overcrowding, enhances the personal safety factor of not only the inmates, but the guards and staff as well.

41. Although the problem is certainly there and will predictably get worse, it appeared from the record that a real effort is being made to alleviate the overcrowding at this prison site. This court feels that the problem is well-recognized. Where inmates and guards alike live in fear of one's life or where the inmates suffer neglect such as poor medical care, this not only unnecessarily inflicts pain, but it is bad penology. If prison exacerbates an inmate's bottled anger, society pays the price when, with freedom, that bottle is uncorked and the anger issues forth. However, a condition that makes little penological sense may not for that reason be unconsti-

tutional. The eighth amendment does not require sound penology; rather, it proscribes the wanton infliction of pain. This court recognizes that while overcrowding itself is not a violation of the eighth amendment, that very overcrowding contributes to the effect of every deficiency in the prison operations. Overcrowding certainly leads to increased violence and it may dilute other constitutionally required services so that they fall below the minimum eighth amendment standards. For example, overcrowding may well reach a level at which the shelter of the inmates is unfit for human habitation. At some point, overcrowded population in such a confined setting itself could very well become an unnecessary or wanton infliction of pain. The task of this court is limited to enforcing constitutional standards and does not embrace setting policy choices or superintending prison administration.

42. To the extent that any Conclusions of Law are deemed to be Findings of Fact, they are incorporated into these Findings of Fact.

## CONCLUSIONS OF LAW

1. To the extent that any Findings of Fact are deemed to be Conclusions of Law, they are incorporated into these Conclusions of Law.

2. At the outset, it should be reiterated that this court is reluctant to intercede in the operation of a state penal facility. That function is best left to the legislative and executive branches of the State of Idaho. However, "[t]here is no iron curtain drawn between the Constitution and the prisons of this country." *Wolff v. McDonnell*, 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974). The appropriate standard for this court in analyzing conditions of confinement is set forth in *Wright v. Rushen*, 642 F.2d 1129 (9th Cir. 1981). In *Wright*, the Ninth Circuit held:

In analyzing a challenge to prison conditions based on the Eighth Amendment, a court should examine each challenged condition of confinement, such as the adequacy of the quarters, food, medical care, etc., and determine whether that condition is compatible with "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958); quoted in *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976) .... Any condition of confinement which passes this test is immune from federal intervention. If no challenged condition fails to meet the test, the entire facility and its administration are immune from Eighth Amendment attack. Of course, each condition of confinement does not exist in isolation; the court must consider the effect of each condition in the context of the prison environment, especially when the ill-effects of particular conditions are exacerbated by other related conditions.... But the court's principal focus must be on specific conditions of confinement. It may not use the totality of all conditions to justify federal intervention requiring remedies more extensive than are required to correct Eighth Amendment violations.

*Id.* at 1133.

### Food

3. The major complaint of the prisoners was that the quantity and quality of food being received by those inmates in close custody and maximum security was impermissibly disparate in comparison to food received by those inmates in medium custody. That problem has been rendered moot because prison administrators have dramatically altered the food services for inmates in close custody and maximum security. The court has been advised that the disparity in terms of quantity and quality has been alleviated.

4. There remains the issue of special diets. Plaintiffs demonstrated at trial that various inmates (Kenneth Volker, Donald Kerst, and John McGonnigal) were supposed to be receiving special diets, but inexplicably were not. Of the three, one is now blind due to his inability to control his diabetes; one spent an extended period of time in the hospital due to a relapse of Crohn's Disease; and the third suffered a

diabetic seizure due to his drinking of a saccharin sweetened juice. While the court cannot say with absolute certainty that the lack of special diets caused these particular results, it was unrefuted that lack of special diets was a contributing factor to each of the incidents. As a matter of law, the evolving standards of decency that mark the progress of a maturing society require prison officials to afford inmates special diets if prescribed for them. Regardless of the cost involved, there is simply no penological justification for depriving inmates with serious medical problems of their duly prescribed diets.

### Clothing

■ 5. As previously mentioned, inmates in protective custody are clothed in lightweight cotton uniforms previously owned by Hughes Airwest Company. While the dramatic coloring of the uniforms enables guards to immediately distinguish those inmates in protective custody, the clothing is patently insufficient to protect those inmates from the cold in the winter months. Protective custody inmates must be afforded either insulated underwear to augment their inadequate clothing, or prison officials must supply them with clothing which is equal to that of those prisoners in medium custody.

### Health Care Delivery System
*Medical Care:*

6. In *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the United States Supreme Court held that:

> [D]eliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain" ... proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.

*Id.* at 104–105, 97 S.Ct. at 291 (citations and footnotes omitted). The Court in *Estelle* went on to hold that, "an inadvertent failure to provide adequate medical care can-

not be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'" *Id.* at 105–106, 97 S.Ct. at 291–92.

■ 7. Medical care at ISCI is clearly deficient in a number of aspects. First and foremost is the fact that there is no medical doctor primarily responsible for the delivery of medical services. Two physicians visiting ISCI for a total of eight hours per week is clearly inadequate not only from the standpoint that it is unlikely that inmates will be able to see a physician for their illnesses and injuries, but also from the organizational and administrative standpoint of the guidance that would be afforded by a full-time doctor. In the case of *Ruiz v. Estelle,* 503 F.Supp. 1265 (S.D. Tex.1980), Judge Justice found that the Texas legislature determined that American Correctional Association standards required nineteen full-time physicians for approximately seventeen thousand inmates. *Id.* at 1308. ISCI maintains the part-time equivalent of one-fifth full-time doctor for approximately eleven hundred inmates.

8. The lack of at least one full-time doctor results in a number of distinct problems. First, there is a lack of organization. Policies and procedures have not been reduced to writing. The American Correctional Association deems written policy and procedures for 24-hour emergency care and training to respond to health-related situations in a four-minute response time so important that it has designated these as "mandatory." American Correctional Association Standards for Adult Correctional Institutions, 2d Ed., §§ 2–4279 and 2–4285 at 71–72 (1981). Second, and more importantly, medical personnel are undertaking performance of functions which should rightfully only be undertaken by a doctor. This relegates inmates to treatment which is inadequate. Medical personnel end up providing treatment for which they are neither trained nor licensed to provide. This practice is deliberately indifferent to the serious medical needs of the inmates. "Access to medical staff has no meaning if the medical staff is not competent to deal with the prisoners' problems." *Hoptowit v.*

*Ray,* 682 F.2d 1237, 1253 (9th Cir.1982). This also runs afoul of American Correctional Association mandatory standards. American Correctional Association Standards for Adult Correctional Institutions, 2d Ed., § 2–4286 at 72. Finally, a full-time doctor would provide needed authority for remedying the inadequate medical facility noted in paragraph 9 of the Findings of Fact. This court thus determines that at least the equivalent of one full-time physician is constitutionally required. It should be noted that this court has not and does not, in taking this action, constitutionalize the American Correctional Association standards. This court merely refers to those standards for guidance.

9. Not only is there no full-time physician, but 24-hour emergency service is also unavailable or, at best, inadequate at ISCI. This court concludes that the evolving standards of decency require that 24-hour emergency medical care be available. The prison population is presently well over a thousand and increasing. The likelihood of the need for emergency care on a 24-hour basis has passed from the stage of a remote possibility to that of a strong probability. Consequently, 24-hour emergency medical care is not only needed, but constitutionally required.

 10. It was clear from the evidence presented that various inmates were denied any access to medical care because of the "kite" system. The standard of "deliberate indifference to serious medical needs" is met in this case because the defendants have effectively denied access to medical care. "Prison officials show deliberate indifference to serious medical needs if prisoners are unable to make their problems known to the medical staff." *Hoptowit v. Ray,* 682 F.2d 1237, 1253 (9th Cir.1982). The American Correctional Association also deems it mandatory that inmates be allowed unimpeded access to health care. *See* American Correctional Association Standard § 2–4300 at 80.

11. While the court has no difficulty in finding that the "kite" system as administered results in the deliberate indifference of prison officials to the serious medical needs of inmates, fashioning a remedy is not as easy. The kite system may be effectual if implemented in an appropriate manner. Consequently, the court will allow defendants ninety (90) days from the date of this order to develop an effective plan and procedure, in writing, insuring that inmates will be afforded access to medical care.

12. Finally, this court is greatly concerned with the limited access to the medical infirmary at ISCI even under the best of conditions. Plaintiffs contended, and it was basically unrefuted, that access to the infirmary is extremely difficult at best or impossible at worst. The facility is locked on a 24-hour basis, and an inmate, even if suffering from a dire emergency, would have difficulty gaining admission. The result is that the infirmary is an ineffectual showplace. Once again, pointing out constitutional deprivations is easier than fashioning a remedy. One of the primary problems, of course, is that there is no full-time physician, or team of physicians, administering the medical delivery system at ISCI. It is essential and mandatory that the State Board of Corrections either hire on staff at least one full-time medical doctor or to contract for the equivalent thereof with a professional medical clinic or team of doctors to provide an adequate medical delivery system at ISCI. With this in mind, the court requires and orders that the State Board of Corrections submit a plan in writing within one hundred eighty (180) days from the date of this order which will cause the medical delivery system at ISCI to be properly staffed and organized to allow for the effective utilization of the infirmary and a follow-up on prescribed treatment. At this time, the court prefers not to order any specific methodology, but merely requires or suggests that the State Board of Corrections develop an adequate plan with adequate staff and personnel, either hired or contracted for, that will put into place a medical delivery system at ISCI that will meet constitutional standards.

*Psychiatric Care:*

 13. In *Bowring v. Godwin,* 551 F.2d 44 (4th Cir.1977), the Fourth Circuit

found that there is "no underlying distinction between the right to medical care for physical ills and its psychological or its psychiatric counterpart. Modern science has rejected the notion that mental or emotional disturbances are the products of afflicted souls, hence beyond the purview of counseling, medication and therapy." *Id.* at 47. This court concurs in that assessment.

14. In *Ruiz v. Estelle,* 503 F.Supp. 1265 (S.D.Tex.1980), Judge Justice formulated six components of a minimally adequate mental health treatment program. Judge Justice formulated these essential components by reviewing judicial precedent in previous prison cases, considering expert testimony, and by applying principles of minimally adequate care as it applies to mental health. *Id.* at 1339. The six essential components established in *Ruiz* are:

First, there must be a systematic program for screening and evaluating inmates in order to identify those who require mental health treatment. *See Pugh v. Locke,* 406 F.Supp. [318] at 333 [ (1976) ]; *Laaman v. Helgemoe,* 437 F.Supp. [269] at 319, 324 [ (1977) ]; *Barnes v. Government of Virgin Islands,* 415 F.Supp. [1218] at 1235 [ (1976) ] *Anderson v. Redman,* 429 F.Supp. 1105, 1121 (D.Del.1977). Second, as was underscored in both *Newman* [*Newman v. Alabama,* 559 F.2d 283 (5th Cir.1977) ] and *Bowring* [*Bowring v. Godwin,* 551 F.2d 44 (4th Cir.1977) ], treatment must entail more than segregation and close supervision of the inmate patients. Third, treatment requires the participation of trained mental health professionals, who must be employed in sufficient numbers to identify and treat in an individualized manner those treatable inmates suffering from serious mental disorders. *See Pugh v. Locke,* 406 F.Supp. at 333; *Laaman v. Helgemoe,* 437 F.Supp. at 324. Fourth, accurate, complete, and confidential records of the mental health treatment process must be maintained. Fifth, prescription and administration of behavior-altering medications in dangerous amounts, by dan-

gerous methods, or without appropriate supervision and periodic evaluation, is an unacceptable method of treatment. Sixth, a basic program for the identification, treatment and supervision of inmates with suicidal tendencies is a necessary component of any mental health treatment program. *See e.g., Collins v. Schoonfield,* 344 F.Supp. [257] at 277 [ (1972) ].

*Id.* at 1339. This court finds the analysis in *Ruiz* persuasive with regard to minimally adequate psychiatric care and adopts the essential elements as Conclusions of Law. The psychological counseling at ISCI is deficient in every respect of the six components established in *Ruiz.*

15. ISCI must develop a systematic program whereby each inmate is evaluated in order to identify those in need of psychiatric treatment. Treatment must involve psychiatric and psychological counseling for those inmates in need of counseling. There must be at least the equivalent of one full-time psychiatrist to provide treatment to those inmates capable of deriving benefit and to establish written procedures whereby inmates are analyzed and their progress monitored. Wholesale prescription of psychotropic drugs is an unacceptable means of dealing with psychiatric disorders. This statement should not be read to prevent the use of psychotropic drugs, merely that the prescription of these drugs cannot supplant the necessity of psychiatric counseling. Finally, it is critical that a program for the identification, treatment, and supervision of inmates with suicidal tendencies and who have previously attempted suicide is essential. During the final two weeks of trial, there were three suicide attempts, one of which was successful. Psychiatric counseling of these inmates is of paramount importance.

16. It is also critical that those inmates who must undergo psychological or psychiatric examination prior to their parole hearings (*see* Idaho Code § 20–233 and discussion at paragraph 23 in the Findings of Fact) must receive psychological counseling if the nature and duration of commitment

is to bear some reasonable relationship to the purpose for which the individual is committed. *See Ohlinger v. Watson*, 652 F.2d 775, 778 (9th Cir.1980). Psychiatric care at the present time is virtually nonexistent at ISCI. It represents a deliberate indifference to the serious medical needs of the inmates at ISCI. As an adjunct to the medical delivery system at ISCI, this court must require the Idaho State Board of Corrections to present to the court an adequate and satisfactory solution to administering the psychiatric needs of inmates at ISCI.

▬▬▬ 17. The State of Idaho through Section 20–223, Idaho Code, having chosen to incarcerate a class of inmates on the basis of being sex offenders, and other categories of mental illness, the State has thus determined that it no longer has an interest in punishing the inmate, but rather in attempting to rehabilitate him. The State's interest in indeterminate incarceration in these category offenses is to provide for the rehabilitation of a sex offender who has disclosed a tendency to be a menace to society. Such rehabilitation would appear to be regarded as compromising the *quid pro quo* for a longer confinement, but under different terms and conditions, than an inmate would undergo if combined under other offense statutes. The rehabilitative rationale is not only desirable, but it is constitutionally required. *Ohlinger v. Watson*, 652 F.2d 775 (9th Cir.1980). *Robinson v. California*, 370 U.S. 660, 666, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962), strongly suggests that the state may not justify an inmate's extended sentence on the basis of mental illness without affording appropriate treatment. *See Ohlinger v. Watson*, 652 F.2d 775, 777 (9th Cir.1980). *Ohlinger* further states:

> Constitutionally adequate treatment is not that which must be provided to the general prison population, but that which must be provided to those committed for mental incapacity. "At the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed."

. . . .

Lack of funds, staff or facilities cannot justify the State's failure to provide appellants with that treatment necessary for rehabilitation.

*Personal Safety*

*Medium Custody:*

▬▬▬ 18. At the outset, it should be noted that "[p]rison officials have a duty to take reasonable steps to protect inmates from physical abuse." *Hoptowit v. Ray*, 682 F.2d 1237, 1250 (9th Cir.1982), citing with authority *Ramos v. Lamm*, 639 F.2d 559, 572 (10th Cir.1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981). As previously noted, medium custody inmates represent the least risk from an institutional standpoint of any classification on the main yard. However, there has been a direct correlation between involuntary double-celling and the level of violence in medium custody. Gang rapes, assaults upon officers and inmates, and suicides are not unknown to medium custody. There are significant freedoms enjoyed by medium custody inmates which increase the likelihood of violence. While this court is unwilling to find that double-celling is unconstitutional *per se*, the conclusion is inescapable that double-celling dramatically decreases personal safety. While this court is unwilling to find double-celling impermissible, this court is willing to take the positive step of requiring a doubling of security in those housing units which are double-celled. "Courts may require prison officials to hire a sufficient number of guards to meet safety needs, depending on the number of prisoners and the structure of the prison. *See Williams v. Edwards*, 547 F.2d 1206, 1213 (5th Cir.1977)." *Hoptowit v. Ray*, 682 F.2d 1237, 1251 (9th Cir.1982). The evidence of young men being brutally raped and the officer in charge being either unwilling or unable to respond to that young man's cries for help is sufficient basis for this court to take such an unwelcome step. Moreover, evidence that correctional officers must use inmates to ensure the safety of other inmates is a clear indication that personal safety is precarious with present staffing. Virtually every wit-

ness at trial, whether an inmate or a member of the correctional staff, testified that the prison was understaffed. Since the trial was completed on this matter, the court has become aware that more than one hundred of the one hundred forty staff members at ISCI have signed a grievance petition which was presented to the director of corrections, pointing out that current staffing levels were inadequate and that there was a present danger and threat to the lives and/or injury of the guards due to understaffing. It is beyond cavil that if the guards are in fear of their own safety, the inmates at the institution are perhaps more justifiably afraid.

*Close Custody:*

19. Prior to trial, close custody was an extremely violent place to live. Virtually every young man assigned to that custody level was brutally raped. Guards and inmates alike were subject to physical assault. Subsequent to the trial, officials at ISCI implemented a plan whereby the open tier policy was significantly curtailed and the inmate population reduced. The goal of prison administrators is to single-cell those inmates in close custody. In comparing ISCI with the Southern Ohio Correctional Facility (SOCF), the prison facility scrutinized by the United States Supreme Court in *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), there are a number of similarities. The size of cells (60 square feet at ISCI, 63 square feet at SOCF); hours on tier (at ISCI inmates are incarcerated from 9:00 p.m. until 7:00 a.m. and can move from cell to day room during a 10-minute period on the hour; inmates at SOCF were incarcerated under a similar plan); yet a major difference between ISCI and SOCF is the level of violence, especially sexual assaults. The Director of Corrections himself testified that while he did not think that ISCI was an especially violent institution, he did find that the level of sexual assaults was extraordinarily high.

20. Prison officials at ISCI have been attempting to reduce the violence in close custody by single-celling inmates and limiting the openness of the tier. Were it not

for the high level of violence at ISCI, this court would be constrained by the decision of the Supreme Court in *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). However, this court finds that the two situations are distinguishable because of the high level of violence at ISCI and because the prison officials themselves have acknowledged the problems inherent in double-celling close custody inmates at ISCI. Substantial evidence was introduced demonstrating that double-celling of close custody inmates resulted in the infliction of unnecessary and wanton pain, and was grossly disproportionate to the severity of crimes warranting imprisonment. *See id.* at 348. It is undisputed that the policy of placing every incoming inmate to the penitentiary in close custody resulted in the brutal rape of virtually every young man assigned to close custody. This indiscriminate policy was and is constitutionally impermissible. However, prior to the beginning of this trial and subsequent to the taking of testimony, the court is faced with an entirely different situation. The authorities at ISCI are making a commendable effort to eliminate double-celling in the close custody units in Houses 8 and 9. Movement on the tier has been significantly circumscribed and the level of violence has been greatly reduced. As presently programmed and maintained, this court is unable to find that close custody at ISCI is constitutionally impermissible in the way that it is now being administered. Hopefully, the Director of Corrections, the Warden at ISCI and the State Board of Corrections will be able to continue this program, and ultimately where an inmate is kept in close custody for most of the 24-hour day, he would not have to be double-celled. In *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), the Supreme Court noted, "state and local authorities have primary responsibility for curing constitutional violations." *Id.* at 687, n. 9, 98 S.Ct. at 2572, n. 9. In this case, prison officials have attempted to remedy the unconstitutional conditions. This court is bound to consider "bona fide steps that

prison officials are taking to alleviate poor prison conditions." *Hoptowit v. Ray*, 682 F.2d at 1247. As a result, this court concludes that close custody, as it presently exists, does not violate prisoner's constitutional rights.

*Protective Custody:*

21. Protective custody is in many respects the worst of the classifications at ISCI. For the "reprehensible" crime of "snitching" on a fellow inmate, inmates in protective custody look forward to double-celling, the same significantly limited tier movement as those inmates in close custody, and a mere one and one-half hours in the gymnasium per week.

22. In placing an inmate in protective custody, prison officials are making a determination that a particular inmate is vulnerable and in need of protection. Unfortunately, due to evidence of rapes having occurred within protective custody and prison officials' admissions that prisoners have made their way into protective custody for no justifiable reason, prison officials are failing in their effort to protect the inmates in protective custody from predatory attacks. This court is bound to "consider the effect of each condition in the context of the prison environment ...." *Wright v. Rushen*, 642 F.2d at 1133. This court concludes that the evolving standards of decency are violated by the protective custody classification as it is presently being administered. However, the court has become aware that under the present Director of Corrections, a solution, or solutions, is being sought to alleviate the oppressive conditions of those inmates held in protective custody. To this end, the defendants shall file a written report with the court, allowing for adequate response by the plaintiffs, within one hundred eighty (180) days of the date of this order.

*Maximum Security:*

23. While there have been isolated incidents of violence in administrative segregation, these acts of violence cannot be attributed to the prison administrators. Inmates in administrative segregation are completely isolated from interaction with other inmates, at least within the officials' abilities. Consequently, the court finds that the operation of the administrative segregation unit, Housing Unit 7, is in compliance with the requirements of the eighth amendment.

*Classification*

24. As previously mentioned, the prison officials at ISCI have developed a new system of classification and reclassification which utilizes, to the extent possible, objective criteria. The only deficiency in the classification and reclassification system noted by this court is that it does not adequately protect those younger individuals likely to be subject to predatory sexual assaults. This court concurs with the conclusion in *Doe v. Lally*, 467 F.Supp. 1339 (1979), that "a fairly clearcut profile of sexual assault victims in prisons can be made, [and] the state should make every effort to identify likely victims of homosexual assaults early in the initial classification process." *Id.* at 1357. Other than the fact that the classification system as presently written does not adequately take into account the protection of those younger inmates likely to be subject to sexual assault, the classification system as written is constitutionally adequate.

*Wholesale Reclassification of the Inmate Population in April 1981*

25. Reclassification does not necessarily give rise to the procedural protections of the due process clause. "As long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." *Montayne v. Haymes*, 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976). However, in *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), the United States Supreme Court found that a state can create a protected liberty interest giving rise to protection of the due process

clause, if the requirements are mandatory. Plaintiffs maintain that the cases of *Crawford v. Dermitt*, 104 Idaho 473, 660 P.2d 938 (1983), and *Wright v. Dermitt*, 104 Idaho 475, 660 P.2d 940 (1983), created a protected liberty interest and that the wholesale reclassification violated the rights to due process enjoyed by the inmates.

■ The cases relied on by plaintiffs are inapplicable for two reasons. In the first place, both *Wright* and *Crawford* dealt with inmates being reclassified to administrative segregation (maximum security). Plaintiffs complain that "[a]ll of the prisoners at the ISCI who were placed into the adverse conditions of confinement in *Close Custody* in April, 1981 were denied any due process of law prior thereto." (emphasis added) Plaintiffs' Post-Trial Memorandum at 59. Plaintiffs maintain that these cases apply to all adverse classification hearings; however, where the liberty interest is created as a result of a state's common law, this court is reluctant to give cases a broader reading than that which the Idaho Supreme Court gives them. In addition, both *Wright* and *Crawford* were decided by the Idaho Supreme Court in 1983, almost two years after the challenged reclassification. Thus, at the time the reclassification was instituted, the law of Idaho giving rise to the protections of due process had not been established. Consequently, the plaintiffs' reliance on *Wright* and *Crawford* is unwarranted given the limited scope of these cases and because they did not establish any due process protections until after the time of the alleged deprivations.

### Due Process Requirements for Parole Hearings

■ 26. In *Izatt v. State*, 104 Idaho 597, 661 P.2d 763 (1983), the Idaho Supreme Court ruled that the predecessor of Idaho Code § 20–223 (Supp.1983) [Idaho Code § 20–223 (1979)] provided only a possibility of parole, and that as a result, it did not give rise to due process protections. In *Izatt*, the supreme court held:

The Idaho statute governing parole is I.C. § 20–223 [Idaho Code § 20–223 (1979)]. In contrast to the Nebraska statute at issue in *Greenholtz [Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979)], I.C. § 20–223 does not set forth detailed conditions and qualifications which once met entitle an inmate to an expectation of parole. I.C. § 20–223 merely sets forth necessary conditions which must be established before parole can be granted, thereby creating only a possibility of parole.

*Id.* at 600, 661 P.2d at 766 (footnote omitted). Plaintiffs argue that the amendment of Idaho Code § 20–223 (Supp.1983) to include the language "shall have the power to establish rules, regulations, policies or procedures in compliance with chapter 52, title 67, Idaho Code," gives rise to an expectation that necessitates the utilization of the procedures set out in the Idaho Administrative Procedures Act.

27. This court is unpersuaded that the amendment of § 20–223 establishes any entitlement which gives rise to the necessity of employing due process considerations in parole decisions. The operative language of Section 20–223 which relates to parole indicates that parole *may* be granted at the discretion of the Commission. The statute construed in *Greenholtz* reads: "Whenever the Board of Parole considers the release of a committed offender who is eligible for parole, it *shall* order his release unless ...." Neb.Rev.Stat. § 83–1, 114(1) (1976) (emphasis added). In finding that the Nebraska statute created a protectible expectation of parole and concomitantly, a liberty interest giving rise to due process protections, the Court was careful to note that "we emphasize that this statute has unique structure and language and thus whether any other state statute provides a protectible entitlement must be decided on a case-by-case basis." *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. at 12, 99 S.Ct. at 2106.

28. This court is of the opinion that the correct interpretation of Idaho Code § 20–223 falls within the holding of the Supreme Court in *Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458, 101 S.Ct. 2460, 69

L.Ed.2d 158 (1981). In *Dumschat*, the Court found that, "[t]he Connecticut commutation statute, having no definitions, no criteria, and no mandated 'shalls,' creates no analogous duty or constitutional entitlement." *Id.* at 466, 101 S.Ct. at 2465. This court reaches this conclusion notwithstanding the amendment of Section 20–223 which inserted a reference to the Administrative Procedures Act (Act), Idaho Code §§ 67–5201–18. The amendment of Section 20–223 simply gives the Commission the power to promulgate rules and regulations in compliance with the Act. It does not *mandate* that the procedural rights established in that Act be utilized in parole hearings. Moreover, the definitional statement of the Act specifically excludes the Board of Corrections from the requirements of the Act. Idaho Code § 67–5201(1). Absent a clear showing that Section 20–223 mandates the use of the procedural requirements set out in the Act and given the fact that the granting of parole is purely discretionary, this court is unpersuaded that a legitimate expectation has been created by the enactment of Section 20–223 and, consequently, finds that the argument of plaintiffs fails.

29. At trial, Ralph Pierce, Executive Secretary of the Idaho Commission of Pardon and Paroles, testified that notwithstanding Idaho Code § 20–101A, prisoners within the statutory construction of Idaho Code § 20–223 were required to serve a full one-third of their sentence or five years, whichever is less, prior to parole consideration. Thus, those inmates serving sentences within the ambit of Idaho Code § 20–223 do not receive any credits for good time until serving one-third of their sentence or five years. This court is aware that this issue is presently being litigated in the Idaho state district courts and because the issue is beyond the scope of issues set out in the pretrial order, this court will refrain from ruling on this particular issue.

### Due Process Requirements for Disciplinary Hearings

■■■■ 30. In *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the United States Supreme Court set out the substantive due process requirements which must be met at inmate disciplinary hearings. The process due an inmate accused of a disciplinary infraction requires (1) that he receive advance written notice of the claimed violation; (2) that he receive a written statement of the fact findings as to the evidence relied upon and reasons for the disciplinary action; (3) that he be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals; (4) where he is illiterate or where the complexity of the issues makes it unlikely that he will be able to collect and present the evidence necessary for an adequate comprehension, he should be free to seek aid of his fellow inmates; or if that is forbidden, to have adequate substitute aid; and (5) that he receive a fair hearing. *Id.* at 563–70, 94 S.Ct. at 2978–81. Given the fact that inmates are routinely segregated prior to a disciplinary hearing, and that inmate representatives are not apprised of the charges or allowed to prepare an adequate defense in a matter of minutes, this court finds that the fourth requirement of *Wolff v. McDonnell* is not being met. The administrators at ISCI need not allow an inmate accused of a disciplinary infraction the run of the prison to prepare an adequate defense; however, if the administration is bent on this policy, it must afford that inmate a surrogate to adequately prepare his defense. When an inmate is segregated prior to his disciplinary hearing and his lay representative learns of the inmate's predictament a few minutes before the hearing is to be held, that inmate's right to due process is infringed. Due process requires that the inmate or his lay representative be given adequate time in which to prepare a defense. While the court is unwilling to specify a minimum time which may be required in all cases, the practice of affording the inmate or his representative only a few minutes before the hearing is not sufficient to satisfy the due process clause of the fourteenth amendment.

31. Plaintiffs also assert that inmates are systematically denied witnesses at dis-

ciplinary hearings. Were this the case, this court would have no difficulty in declaring such action as violation of due process. *See Bartholomew v. Watson*, 665 F.2d 915 (9th Cir.1982). "The right to call witnesses is basic to a fair hearing. A blanket proscription against the calling of certain types of witnesses in all cases involving institutional security is an overreaction which violates minimal due process." *Id.* at 918. However, this court is unpersuaded that a blanket proscription against calling witnesses exists at ISCI. From the evidence presented, it appeared that disciplinary hearing officers determined whether or not witnesses should be called on a case-by-case basis.

## ORDER

Based on the foregoing Findings of Fact and Conclusions of Law, and the court being fully advised in the premises,

IT IS HEREBY ORDERED:

1. That a special dietary program shall be developed which takes into account the nutritional needs of the medically infirm. In cases where a physician prescribed a special dietary program for an inmate, the Institution shall provide the necessary food required by the special diet;

2. That inmates housed in protective custody shall be afforded either insulated underwear to augment their inadequate clothing, or they shall be supplied with alternative clothing which is equal to that of those prisoners in medium custody;

3. That 24-hour emergency medical care shall be made available to the inmates at ISCI. In addition, the prison administration shall develop a system in writing which allows inmates unimpeded access to medical care. The administration shall have ninety (90) days from the date of this order in which to develop the above-referenced system. As part of these changes, the administration shall cause to be hired, or contracted for, the equivalent of at least one full-time physician to minister to the medical needs of the inmates;

4. That the State Board of Corrections shall submit a plan in writing within one hundred eighty (180) days from the date of this order which will cause the medical delivery system at ISCI to be properly staffed and organized to allow for the effective utilization of the infirmary;

5. That the State Board of Corrections shall submit a plan in writing within one hundred eighty (180) days from the date of this order which will establish a psychiatric care program for the inmates as required by Conclusion of Law Nos. 14 through 17 herein;

6. That if the prison administration determines to double-cell inmates in medium custody, the administration shall then be required to employ twice the security personnel on those medium security tiers where the double-celling takes place;

7. That the State Board of Corrections shall file a written report within one hundred eighty (180) days of the date of this order as required by Conclusion of Law No. 22;

8. That an initial inmate classification and reclassification system shall be established which will identify and protect younger individuals who are likely to be subject to predatory sexual assaults. Once those inmates are identified, precautions shall be taken to avoid placing those inmates in jeopardy of sexual assault; and

9. That the prison administration shall develop a procedure to use prior to inmate disciplinary hearings which will provide the protections required by due process considerations as outlined in Conclusion of Law No. 30.