Samuel LeMAIRE, Plaintiff,

v.

Manfred (Fred) MAASS, Superintendent, Oregon State Penitentiary, Defendant.

No. CV 89–382–PA.

United States District Court, D. Oregon.

Aug. 31, 1990.

Spencer M. Neal, Ginsburg, Gomez & Neal, Portland, Or., for plaintiff.

Dave Frohnmayer, Atty. Gen., Jan Peter Londahl, Asst. Atty. Gen., Dept. of Justice, Salem, Or., for defendant.

## OPINION

PANNER, Chief Judge.

Plaintiff, Samuel LeMaire, an inmate at Oregon State Penitentiary (OSP), brings this civil rights action under 42 U.S.C. § 1983, against defendant Manfred Maass, the OSP Superintendent. He seeks injunctive relief from allegedly unconstitutional conditions of his imprisonment in the Disciplinary Segregation Unit (DSU) at OSP. I toured the DSU and conducted a court trial at OSP. These are my findings of fact and conclusions of law under Fed.R.Civ.P. 52(a).

Plaintiff brings two claims, an eighth amendment claim for cruel and unusual punishment, and a fourteenth amendment due process claim for deprivation of due process. I find for plaintiff on both claims.

## ISSUES

Plaintiff's claims concern a number of specific conditions of his confinement.

### I. Use of In-cell Restraints

Plaintiff contends that keeping him in full mechanical restraints for extended periods while he is in his cell is unconstitutionally cruel and unusual punishment because it inflicts pain without a legitimate penological justification.

### II. Use of Restraints in the Shower

Plaintiff contends that requiring him to shower in full mechanical restraints is an unconstitutionally deliberate disregard for his personal safety and lacks penological justification.

### III. Controlled Feeding Status and Nutraloaf

Plaintiff contends that DSU guards place him on a controlled diet of "Nutraloaf" for punitive purposes, without due process and without legitimate penological justification.

### IV. Use of Quiet Cells

Plaintiff contends that isolating him in a quiet cell, which is illuminated 24 hours per day, is an unconstitutionally deliberate disregard for his serious medical needs because he is unable to summon guards for assistance. He also contends that continuous illumination causes him physical and psychological harm and lacks legitimate penological justification.

## V. Strip Status

Plaintiff contends that leaving him unclothed in his cell for extended periods causes him pain and suffering and lacks legitimate penological justification.

## VI. Exercise and Opportunity for Exposure to the Outdoors

Plaintiff contends that the long-term denial of out-of-cell exercise and the opportunity to go outdoors is a deliberate disregard for his serious medical needs.

## FACTS

### I. Plaintiff

Plaintiff is serving a life sentence at OSP. He has been confined at OSP since December, 1985. He has been in the DSU since November 28, 1986. At the time of trial, his scheduled release date from the DSU into the general prison population was February, 1993. Plaintiff has committed numerous disciplinary violations at OSP, including assaults and destruction of property.

Plaintiff is 5'9" tall. He weighed 225 pounds when he entered the prison. At the time of trial he weighed approximately 285 pounds. He has a medical history of hypertension, epilepsy, and vertigo. He is under medical treatment for anxiety and depression with Triavil, a tranquilizer.

### II. The DSU

The DSU is a building separate from the main OSP building. Its purpose is to segregate disruptive and dangerous inmates from the general prison population. The DSU has ninety cells on three tiers. Forty-four are double-bunked.

The DSU cells are eight feet high, six feet wide, and eight feet, four inches deep. In this space is a bed, single or bunked, a toilet, and a sink. The floors are concrete. Three walls of the cells are concrete and the fourth is bars, facing the tier. The showers in the DSU have concrete floors and are open on one side. They are raised above the floor level so it is necessary to step up into them.

One part of the DSU is known as the close supervision tier (CST). CST cells are single bunked. Six CST cells, known as "quiet cells" or "close supervision cells with outer door construction" are closed to the tier with solid steel doors. The quiet cell area is separated from the rest of the CST and from the DSU staff office by a second solid steel door, which is normally kept closed. The quiet cells are lighted 24 hours per day.

### III. The Exercise Yard

Outside the DSU is a fenced concrete yard. Until recently, the yard was used for DSU inmate outdoor exercise. In October 1988, OSP built fifteen "exercise cubicles." The cubicles line two sides of the yard. Since the cubicles were built, the inmates no longer use the yard.

The cubicles are fenced with heavy wire mesh on all sides and the top. They are bare and exposed to the elements. The cubicles measure ten feet wide, eight feet five inches wide, and eight feet two inches high. The floors are concrete.

### IV. Strip Status

Plaintiff and other DSU inmates have been subjected to a practice in the DSU known as "strip status". Strip status occurs when DSU staff strip DSU inmates of clothing, bedding, and personal possessions.[1] Once stripped, plaintiff has been left unclothed and without bedding until he "earns" the items back piece-by-piece with good behavior.

### V. In-cell and Shower Restraints

OSP regulations permit DSU staff to place an inmate in full mechanical restraints in his cell, under certain conditions. Full mechanical restraints means leg irons

---

1. OSP regulations permit DSU staff temporarily to take away from a DSU inmate, any "service or activity" when the inmate is using them to damage property, obstruct security, or threaten violence to himself or others. OAR 291-11- 064(1). The regulation requires that the confiscated items be returned "at the earliest possible time when the basis for removal has ceased to exist." *Id.*

and bellychains. The use of full mechanical restraints in the cell must be done "with the express approval of the superintendent or designee". OAR 291–13–035(2). The practice is permitted when the inmate is out of control and could cause major destruction of property, a serious hazard to himself or others, or a serious escalation, and no other form of control would be effective. *Id.* In full restraints, an inmate cannot raise his hands to his face.

## VI. Nutraloaf

DSU inmates can be placed on a controlled diet of a substance called Nutraloaf. Nutraloaf is made from blending, freezing and later baking foods used in meals. It is designed to be eaten without utensils to "reduce the use of food, eating utensils and human waste as weapons." Exh. 18; OAR 291–83–005.

Under the OSP regulations, "[f]ood is never to be used as a reward or as a disciplinary sanction." Exh. 5 at 8; OAR 291–11–060(2)(c). DSU inmates may be put on "controlled feeding status", i.e. Nutraloaf, without a prior hearing, when they throw or misuse food or human waste, or misuse or fail to return trays or utensils. Exh. 18 at 1; OAR 291–83–010(1). A DSU inmate may be placed immediately on controlled feeding status, with the approval of the Security Manager or designee. *Id.;* OAR 291–83–015(1). The controlled feeding order is to be reviewed every 24 hours from the time of the reported misconduct, and "shall be rescinded when the inmate demonstrates a return to acceptable behavior for a period of 24 hours." *Id.* at 2; OAR 291–83–015(6)–(7). Under DSU regulations, the maximum time on controlled feeding status is seven days. *Id.* at 2; OAR 291–83–015(8).

## VII. Exercise

### A. *Exercise Opportunities*

Normally, DSU inmates are permitted out of their cells for twenty minutes per day, five days per week. During that period, they may exercise either on the tier or in the exercise cubicles. Outdoor exercise is considered a privilege to be earned after 45 days without disciplinary violations. Inmates must use that same twenty minute period to shower, shave, and obtain supplies.

DSU inmates who violate disciplinary rules can be sanctioned by the loss of exercise privileges or "LEP status". LEP status can last for up to one month per sanction, following an informal disciplinary hearing, OAR 291–105–036(2), or up to six months following a formal disciplinary hearing, OAR 291–105–051(2). Inmates on LEP status are permitted out of their cells ten minutes per day three days per week, for showering, but are not permitted to exercise on the tier or in the outdoor cubicles.

LEP sanctions can accumulate. At the time of trial, in February, 1990, plaintiff had been on LEP status since August, 1989, and was scheduled to remain on LEP status until February, 1991. Before that, he had been on LEP status for almost two years. By the time his DSU sanction expires, plaintiff will have been prohibited out-of-cell exercise for most of a five-year period. There is no rule prohibiting exercise in the cells.

### B. *Clothing and Footwear*

DSU inmates normally wear one piece jump suits. Their only footwear is shower thongs. They have no other footwear or clothing to wear while exercising. Clothing is exchanged three times a week on assigned days. When DSU inmates are permitted to exercise in the outdoor cubicles, they may wear unlined denim jackets and wool caps, but do not receive waterproof footwear or clothing when they use the cubicles in the rain. They may not receive clean or dry clothing after exercise or outdoor periods, except at scheduled exchange times.

## APPLICABLE LAW

I address the general legal standards applicable to this case. In my later discussion of each claim, I address the law specific to that claim.

I. Applicability of the Eighth Amendment and Fourteenth Amendment Due Process Rights to Prison Conditions

A. *Eighth Amendment*

The eighth amendment of the United States Constitution prohibits "cruel and unusual" punishment. The eighth amendment applies to the States through the fourteenth amendment. *Robinson v. California*, 370 U.S. 660, 666, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962). "[Imprisonment] ... is a form of punishment subject to scrutiny under eighth amendment standards." *Hutto v. Finney*, 437 U.S. 678, 685, 98 S.Ct. 2565, 2570, 57 L.Ed.2d 522 (1978). "Underlying the eighth amendment is a fundamental premise that prisoners are not to be treated as less than human beings." *Spain v. Procunier*, 600 F.2d 189, 200 (9th Cir.1979) (quoting *Furman v. Georgia*, 408 U.S. 238, 271–73, 92 S.Ct. 2726, 2742–44, 33 L.Ed.2d 346 (1972) (Brennan, J., concurring)).

II. Determining What is "Cruel and Unusual"

■ The terms "cruel and unusual" must be interpreted in a "flexible and dynamic manner." *Gregg v. Georgia*, 428 U.S. 153, 171, 96 S.Ct. 2909, 2924, 49 L.Ed.2d 859 (1976). The standard for deciding whether prison conditions are "cruel and unusual" must "draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958). Therefore, in light of a "flexible and dynamic" standard, the court's judgment about eighth amendment standards must be "informed by current and enlightened scientific opinion as to the conditions necessary to insure good physical and mental health for prisoners." *Spain v. Procunier*, 600 F.2d at 200. The standard should be based to the maximum extent possible on objective factors. *Rummel v. Estelle*, 445 U.S. 263, 274–75, 100 S.Ct. 1133, 1139–40, 63 L.Ed.2d 382 (1980).

Modern eighth amendment doctrine protects prison inmates against more than just the most barbaric physical punishments that troubled the Court in earlier times. *Rhodes v. Chapman*, 452 U.S. 337, 345–46, 101 S.Ct. 2392, 2398–99, 69 L.Ed.2d 59 (1980) (citing *Wilkerson v. Utah*, 99 U.S. 130, 25 L.Ed. 345 (1879); *In re Kemmler*, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890)). Recent eighth amendment prison condition litigation has established certain broad principles.

First, the Constitution does not require "comfortable prisons." *Rhodes v. Chapman*, 337 U.S. at 349, 101 S.Ct. at 2400. Nor does the eighth amendment require sound prison management. *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir.1982).

■ However, the eighth amendment does prohibit "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104–5, 97 S.Ct. 285, 291–92, 50 L.Ed.2d 251 (1976). It also prohibits the "unnecessary and wanton infliction of pain", which includes sanctions so lacking in penological justification that they constitute the "gratuitous infliction of suffering." *Gregg v. Georgia*, 428 U.S. at 173, 96 S.Ct. at 2925; *Estelle v. Gamble*, 429 U.S. at 103, 97 S.Ct. at 290.

B. *Fourteenth Amendment Due Process Rights*

■ The fourteenth amendment of the United States Constitution protects against the deprivation of property and liberty interests without due process of law. A state may create protected liberty or property interests. *See Hewitt v. Helms*, 459 U.S. 460, 469, 103 S.Ct. 864, 870, 74 L.Ed.2d 675 (1983); *Olim v. Wakinekona*, 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983). When state law or regulation substantively limits the discretion of prison officials by imposing requirements as a condition of forfeiture of property, benefits, or conditions of confinement, the state creates an expectation or entitlement which cannot be taken away without due process of law. *Olim*, 461 U.S. at 249, 103 S.Ct. at 1747. To determine what process is due, the court must balance the determination of the "precise government function involved" against the "private interest that

has been affected by government action". *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). This is a flexible concept. *Id.*

III. Scope of Judicial Intervention in Prison Administration

The Supreme Court has cautioned courts against undue interference with operations of prisons:

> [T]he inquiry of federal courts into prison management must be limited to the issue of whether a particular system violates any prohibition of the Constitution.... The wide range of "judgment calls" that meet constitutional ... requirements are confined to officials outside the Judicial Branch of Government.

*Bell v. Wolfish*, 441 U.S. 520, 562, 99 S.Ct. 1861, 1886, 60 L.Ed.2d 447 (1979). The Supreme Court adopted a frequently-quoted statement from the Second Circuit, that "[a]n institution's obligation under the eighth amendment is at an end if it furnishes sentenced prisoners with adequate food, clothing, shelter, sanitation, medical care, and personal safety." *Id.* at 530 n. 11, 99 S.Ct. at 1869 n. 11 (quoting *Wolfish v. Levi*, 573 F.2d 118, 125 (2d Cir.1978)); *Hoptowit v. Ray*, 682 F.2d at 1246–47 (quoting identical language adopted in *Wright v. Rushen*, 642 F.2d 1129, 1132–33 (9th Cir.1981)).

■ A court should limit an equitable decree to what is necessary to correct the constitutional infirmities that made judicial intervention necessary. *Hoptowit v. Ray*, 682 F.2d at 1246; *Wright v. Rushen*, 642 F.2d at 1133 ("Prison reform, beyond the standards required by the Eighth Amendment, is the function of state government officials."); *Spain v. Procunier*, 600 F.2d at 194. A court should defer to policy choices of prison officials unless those choices are inconsistent with the eighth amendment. *Hoptowit v. Ray*, 682 F.2d at 1247. In fashioning a remedy, a court must consider the cost and effect on legitimate security needs of a prison. *Id.* at 1247.

In addition to its admonitions against undue judicial interference, the Court has also made it clear that the ultimate duty of a federal court to correct constitutionally impermissible conditions of state confinement is well-established. *Bell v. Wolfish*, 441 U.S. at 562, 99 S.Ct. at 1886; *see also Hutto v. Finney*, 437 U.S. at 687 n. 9, 98 S.Ct. at 2571 n. 9; *Procunier v. Martinez*, 416 U.S. 396, 405–06, 94 S.Ct. 1800, 1807–08, 40 L.Ed.2d 224 (1974); *overruled on other grounds, Thornburgh v. Abbott*, 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989). The Supreme Court has upheld wide discretion by trial judges to correct unconstitutional prison conditions. *Rhodes v. Chapman*, 452 U.S. at 356 n. 4, 101 S.Ct. at 2404 n. 4 (citing *Hutto v. Finney*, 437 U.S. at 687–88, 98 S.Ct. at 2571–72). In *Spain v. Procunier*, the Ninth Circuit commented that "[m]echanical deference to ... state prison officials in the context of the eighth amendment would reduce that provision to a nullity in precisely the context where it is most necessary." 600 F.2d at 194.

IV. Scope of Eighth Amendment Analysis

■ An eighth amendment analysis of prison conditions must be based on an examination of each challenged condition individually, to determine whether it meets "the evolving standards of decency that mark the progress of a maturing society." *Wright v. Rushen*, 642 F.2d at 1133 (quoting *Trop v. Dulles*, 356 U.S. at 101, 78 S.Ct. at 598). The analysis must be specific to each challenged condition and not based on the totality of the circumstances. However, the court must consider the effect of these conditions in the context of a prison environment, and the possibility that one condition will exacerbate the effect of another in that setting. *Id.* (*comparing Spain v. Procunier*, 600 F.2d at 199) (outdoor exercise required where prisoners confined in small cells almost 24 hours per day), *with Clay v. Miller*, 626 F.2d 345, 347 (4th Cir.1980) (outdoor exercise not required where prisoners had access to day room 18 hours per day).

## DISCUSSION

Judge Kennedy (now Justice) wrote in *Spain v. Procunier*, "[t]he case is difficult

because it requires us to pass upon measures adopted by prison officials for the safe custody of some of the most dangerous men in the prison population." 600 F.2d at 192. Working under the constant threat of unpredictable assaults and bombardment with feces, urine, spit, food, and any available movable object, as DSU staff does, is a nightmare. It is understandable that in such a hostile, violent, and confrontational environment, inmates who are locked down and isolated for almost 24 hours a day, sometimes for years on end, in tiny, damp, smelly cells, with absolutely nothing to do, will strike out any way they can. It is understandable that guards will retaliate.

Prisoners who complain about the conditions of their confinement do not generally get much sympathy from society, but sympathy is not the issue here. From society's long-term perspective, there are sound reasons for prohibiting cruel and unusual punishment. People who are abused and treated with violence are those most likely to treat others abusively and violently. Under the Oregon corrections system, many DSU inmates will soon be on the streets. Confining people under conditions of extreme violence, fear and hostility, and releasing them into society is like throwing a ticking time bomb into a crowd.

No court can order everyone in the DSU, staff and inmates, to coexist without violence. Hopefully, the violence level will decline and staff safety will improve when inmates are afforded their constitutional rights.

## I. General Issues

I first address the general issues of standing and *respondeat superior* liability, credibility, and the use of punishment in the DSU.

### A. *Respondeat Superior Liability and Standing*

Defendant contends that he cannot be held liable for violations of plaintiff's constitutional rights because plaintiff failed to show either defendant's personal participation and direction or an official custom or policy of constitutional violations. *See, e.g., Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). He also challenges plaintiff's standing, for failure to show likelihood that harm will recur absent injunctive relief. I reject both arguments.

Defendant has not made it clear whether he seeks to dispose of this entire action based on the *respondeat superior* argument, or only what he characterizes as the "skin search" claim.[2] I need not sort that out, because I find a clear basis for defendant's direct liability on all claims.

■ Plaintiff is not required to show that defendant personally stripped him, to establish a basis for liability. He must show that defendant had sufficient notice of or involvement in the practice. *Cf., Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1975) (municipal *respondeat superior* liability issue, rejecting grant of injunctive relief against police commissioner, for unconstitutional conduct of unnamed police officer, in part for lack of showing of personal involvement of supervisory personnel in the conduct); *Hague v. C.I.O.*, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1938) (permitting injunctive relief against government officials where officials had notice of unconstitutional conduct of subordinates and failed to prevent a recurrence).

Even if a showing of direct involvement is required, I find that plaintiff has made such a showing. The record contains substantial evidence of direct communications between DSU staff, defendant, and defendant's high-level subordinates, showing defendant's close involvement in managing the DSU and monitoring the practices there. Defendant's testimony showed him to be knowledgeable about details of the practices and policies in the DSU. Many

---

**2.** Defendant appears to be trying to turn plaintiff's "strip status" claim into a "skin search" claim. I have never understood this action as a challenge to the practice of skin searching inmates for contraband, nor have I ever understood why defendant consistently treats this action as though it is.

OSP rules require direct approval by defendant or his designee for staff to take certain actions. *See e.g.* OAR 291–13–035(2). Defendant has had ample notice of, control over, and involvement in the practices at issue in this action. Plaintiff also has shown an official custom or policy of violations.

■ Defendant's standing argument is equally unpersuasive. He contends that because any improper withholding of personal property was merely an "oversight" in the past, and is unlikely to recur, plaintiff has not met his burden of showing injury will likely recur, citing *Sample v. Johnson,* 771 F.2d 1335, 1340 (9th Cir. 1985), *cert. denied,* 475 U.S. 1019, 106 S.Ct. 1206, 89 L.Ed.2d 319 (1986).

To accept this argument would require me to accept that any past failure to return personal property promptly was only an isolated "oversight". I do not, because the record is replete with evidence of violations of regulations, and devoid of evidence showing official action to correct the violations. I heard no evidence that anyone systematically treats staff violations of regulations or inmates' rights seriously. There is no evidence of disciplinary action in response to "oversights", that any measures were taken to ensure that "oversights" would not happen again, or that staff considered "oversights" to be a problem. I cannot conclude that violations would not recur absent injunctive relief.

### B. *Credibility*

Plaintiff is a convicted murderer serving a life sentence. Defendant is a high-level state official. Because of this contrast, I am compelled to comment about the parties' relative credibility, based on the record and my observations of the parties at trial.

Plaintiff's testimony, and that of other DSU inmates, was credible and commendably forthright. They made no attempt to evade or mislead, nor did they cover up or deny the fact that their conduct in the DSU has been dangerous, disruptive, and offensive. Plaintiff's testimony and evidence related directly to the issues of the case. His expert testimony was clear and to the point.

In contrast, I found defendant's evidence generally evasive and incomplete. He sidestepped important issues. For example, in response to questions regarding the use of strip status, defendant repeatedly said "there is no such thing as strip status". This was remarkable, in light of unmistakably clear evidence, much of which in defendant's own records, that strip status exists in the DSU.

Another example is the testimony of Dr. Goldberg, defendant's expert. He testified that inmates could safely get adequate in-cell exercise. He also said that he would not normally advise someone to do even low or non-impact aerobics in bare feet. Dr. Goldberg co-authored an article, Exh. 47, strongly advising thorough medical assessments and a carefully tailored program of exercise, neither of which defendant uses. Dr. Goldberg's own videotape showed clearly that exercising in shower thongs on a blanket placed on the floor is dangerous. Dr. Goldberg made no attempt to reconcile these contradictions, nor did defendant offer other testimony or evidence to fill or explain these gaps. Defendant's case was full of internal contradictions and left substantial, credible, legally significant evidence uncontroverted and unimpeached.

### C. *Punishment in the DSU*

Throughout his case, defendant repeatedly used the term "behavior control", as opposed to "punishment", perhaps in the belief that if called "behavior control", prison practices pass constitutional muster, but if called "punishment" they do not. This misconstrues the eighth amendment, which prohibits cruel and unusual punishment, not all punishment.

Despite vehement denial of any use of "punishment" in the DSU, defendant failed to controvert substantial evidence showing that sanctions in the DSU are imposed for periods extending long past the misbehavior, and the use of sanctions lacking any connection to the misbehavior supposedly

to be controlled. I see no substantive difference between "behavior control" and "punishment". *See United States v. Michigan*, 680 F.Supp. 270, 274 (W.D.Mich. 1988) (subsequent case history omitted). The issue in this case is not whether there is "punishment" in the DSU, because there clearly is, but rather whether the punishment is "cruel and unusual".

I now turn to an analysis of plaintiff's specific claims.

## II. Use of In-cell Restraints

■ There was uncontroverted evidence that plaintiff has been held in his cell for days at a time, in full mechanical restraints, without clothing, bedding, or personal property. OSP regulations provide that the inmate will be released "as soon as it is reasonable to believe that the behavior leading to the use of restraints will not immediately resume", OAR 291–13–035(2)(c).

The evidence showed incidents where in-cell restraints were used when there was no record of a continuing emergency, or medical justification for doing so. Defendant presented no evidence of a control procedure to ensure that this practice is used only for safety purposes and limited to the time necessary to serve that purpose.

Plaintiff has been on in-cell restraint status several times, once for three days. Inmate Schoonover was in restraints inside his cell from August 16 until August 23, 1989 after an incident in which he, plaintiff, and Inmate McPhail were accused of throwing excrement on an orderly. Inmate Henderson was in restraints in his cell for five days for resisting a body cavity search. Inmates McPhail and Powell have been confined without clothing in their cells in leg irons and bellychains for several days at a time. The testimony of these witnesses was uncontroverted and unimpeached.

The inmates described the difficulty in eating, sleeping, drinking water, and performing the most basic of tasks in their cells while in full restraints. They testified that being in restraints makes it more difficult to stay warm in their cells while they are on strip status.[3]

I questioned defense witness Nicholas Armenakis, the OSP Security Manager, about the justification for restraining an inmate in his cell, after everything, including clothing has been taken from him. He said that it was to control the inmate's behavior. Defense witness Lieutenant Andrews, the Officer in Charge of the DSU, testified that "some inmates are restrained inside their cell when they're out of control." Tr. at 155. For example, he said that inmates can try to dismantle locks, tie up the bars with their bed sheets or use cups to throw excrement. When asked again how inmates could do these things if all their property had been removed from the cell, Andrews' only response was that DSU staff tried to get the property back to the inmates as soon as possible, and that some inmates are restrained in their cells so they cannot remove surgical masks placed on them to prevent spitting.

Plaintiff's uncontroverted testimony was that the long-term in-cell use of restraints is painful. I accept this testimony as credible. It is also self-evident. Plaintiff's expert psychiatrist, Dr. Rundle testified that this practice is psychologically harmful. His testimony was uncontroverted and credible. I accept Dr. Rundle's testimony.

Defendant offered no plausible legitimate justification for the use of such a harsh and extreme practice. It is clear that individual guards decide whether and how long in-cell restraints will be kept on, with no meaningful monitoring or supervision. Guards exposed to constant abuse by inmates cannot be expected always to make reasonable, controlled judgments about the appropriate response to inmate misbehavior.

The use of in-cell restraints causes pain and suffering, is a deliberate disregard for serious medical and safety needs and lacks a legitimate penological justification. It is cruel and unusual punishment.

**3.** The use of strip status is discussed in Section IV.

## III. Use of Restraints in the Shower

██ Plaintiff has been required to shower in full mechanical restraints. Plaintiff and Inmate McPhail have both fallen in the shower while in restraints. Plaintiff required medical treatment as a result of the fall.[4] Plaintiff described the difficulty maintaining and regaining his balance in the shower, while in restraints. I accept this testimony.

People frequently fall in showers without restraints. Requiring someone to shower in full restraints is deliberate indifference to his personal safety. The risk of injury from showering in restraints is high and foreseeable. It has no legitimate penological justification.[5] I find the use of in-shower restraints unconstitutional.

## IV. Controlled Feeding Status and Nutraloaf

██ Inmates have a right to nutritionally adequate food, but the constitution does not require that it be tasty or attractive.[6] *See United States v. Michigan,* 680 F.Supp. at 275 (summarizing cases). The Oregon Court of Appeals recently held that the use of Nutraloaf under the controlled feeding rule is not *per se* unconstitutional. *Smith v. Oregon State Dep't of Corrections,* 101 Or.App. 539, 792 P.2d 109 (1990). The *United States v. Michigan* court reached this same conclusion earlier in principle, where "food loaf", apparently similar to Nutraloaf, was used as a tempo-

rary measure for "behavior control". However, the *Michigan* court expressly declined to hold that all use of food loaf would be constitutionally permissible. 680 F.Supp. at 274–76.

██ *Smith v. Oregon Dep't of Corrections* was a facial challenge to the controlled feeding rule. I agree with the Oregon Court of Appeals that the use of Nutraloaf is not *per se* unconstitutional because it is a valid, temporary, safety measure when its use is directly connected to the misconduct it is intended to curb. However, *Smith v. Oregon Dep't of Corrections* is not on point. The issue here in the punitive use of Nutraloaf, not the validity of the controlled feeding rule.

Plaintiff contends that Nutraloaf is used punitively and is constitutionally impermissible. Defendant denies that Nutraloaf is used as punishment. He testified that Nutraloaf is used only as an emergency measure to "control behavior". In his deposition, defendant testified that the seven-day limit on Nutraloaf feeding was

> to make sure that the [DSU] officer is not in a position to punish an inmate and that there is a review.... [I]f they had the authority to impose controlled feeding, for instance, for more than seven days, it may be interpreted by someone to be punishment, and we do not give the authority to officers to punish inmates.

In *Smith v. Oregon Dep't of Corrections,* 101 Or.App. 539, 792 P.2d 109, 110 (1990), inmates challenging the controlled feeding regulation described Nutraloaf as follows:

> Nutraloaf is made by taking whatever foods are left over during production of a regular prison meal, grinding same together and then forming the resulting mass into bricks which are baked until hard. The process is virtually identical, and produces a similar end product, to that employed in making many packaged dog foods. The major difference being that dog food is at least intended to appeal to a dogs [sic] appetite.

The *United States v. Michigan* court said that "[t]here can be no doubt that eating food loaf is less pleasant than eating a regular prison meal, and thus it is not difficult to conclude that inmates placed on food loaf consider it to be a punishment for misconduct." 680 F.Supp. at 274.

---

**4.** OSP nurse Margaret Collatt testified that plaintiff's medical records show no complaint about an injury from falling in the DSU due to restraint status. However, a DSU log entry for February 17, 1987 says:

> Inmate LeMaire slipped and fell coming out of the shower.... Inmate LeMaire was handcuffed. This occurred at 7:11, med was called 7:12.... Nurse on tier 7:16. Ambulance in 8:05. LeMaire taken to SMH 8:15.

Exh. 6. Defendant offered no explanation for why plaintiff's medical records failed to reflect this incident.

**5.** Defendant testified that he is considering installing locked doors on the showers, so inmates can shower without restraints. Exh. 50 at 56, lines 15–25.

**6.** I am relieved that the constitution does not require me to decide whether Nutraloaf is tasty.

Exh. 50 at 39, lines 7–16. However, defendant also said that even if the inmate does not misbehave for 24 hours, the DSU officer in charge still has the discretion to continue controlled feeding for another 24 hours. *Id.* at 23, lines 5–12.

Defense witnesses gave examples of the use of Nutraloaf. For example, defendant said that when an inmate urinates onto the tier, he might be put on Nutraloaf to "control his behavior". *Id.* at 30, lines 11–20. He explained that on Nutraloaf, the inmate still gets the nutrition and calories to which he is entitled, but "he doesn't have enough liquids in his system to continue to pee on [DSU] officers." *Id.* at 31, lines 8–14.

Defendant also testified that an inmate who throws feces and urine with his dishes or utensils can be put on Nutraloaf. *Id.* at 26, lines 5–8. He said that inmates throw feces and urine with their hands, newspapers, mail, and other receptacles they make, and can be put on Nutraloaf for that as well. *Id.* at 26, lines 12–14. Armenakis testified in his deposition that inmates are commonly put on controlled feeding orders for throwing feces and urine, because that is the "same" as throwing food. Exh. 49 at 32, lines 22–25, 33, line 1–2. Yet he also said that taking away cups after meals would not stop inmates from throwing feces and urine because they would use some other device that would still be available on controlled feeding status. *Id.* at 33, lines 24.

Plaintiff testified that the standard DSU practice is to keep an inmate on Nutraloaf for a full seven days, regardless whether the inmate has continued to violate the controlled feeding rules. Defendant did not controvert or impeach that testimony.

The documentary evidence shows that inmates are put on controlled feeding status for reasons other than misuse of food or utensils and remain on controlled feeding status after misbehavior has ceased. For example, a controlled feeding order for Inmate William Young shows that the reason for the order was the inmate had spit on a guard and "has demonstrated by his actions that he will use food as a weapon against staff." The report says only that

the inmate's sputum contained food particles. It noted no throwing or other misuse of food. . Exh. 19.

DSU records show that on the second shift on October 28, 1988, plaintiff threw urine on a guard and was moved to a quiet cell. Apparently he was put on Nutraloaf because the records show the next day he was still on Nutraloaf. The record noted that he was "calm and appropriate" on the third shift of that day. The following day, on the third shift, plaintiff received his jumpsuit, sheets and thongs, but was still receiving Nutraloaf. There is no record of plaintiff throwing or misusing food or utensils during this incident. Exh. 7.

In light of the record, I conclude that the use of Nutraloaf as punishment violates plaintiff's eighth and fourteenth amendment rights.

#### A. *Eighth Amendment*

■ In *United States v. Michigan,* the court held that the use of food loaf was not cruel and unusual under the facts presented, but made it clear that under different facts, the outcome might be different. The analysis in *Michigan* is sound.

First, the court had no trouble characterizing the use of food loaf as punishment, despite the defendants' protestations to the contrary, based on an analysis of the actual use of food loaf. 680 F.Supp. at 274. Second, the court was careful to point out that it found it significant, if not controlling, that there was no evidence that inmates refused to eat food loaf, or suffered adverse effects from a food loaf diet. 680 F.Supp. at 275.

Finally, the court noted that its opinion should not be interpreted to say that the use of food loaf as a sanction for "relatively innocuous misbehaviors" would not pose a constitutional question. *Id.* at 276 (citing cases). In particular, the *Michigan* court pointed to *Moss v. Ward,* 450 F.Supp. 591, 596 (W.D.N.Y.1978), where the court specifically noted that

[a]lthough being deprived of one or two meals might not be cruel and unusual punishment, prison officials cannot im-

pose such severe sanctions for breaking a disciplinary rule ... when *there is no showing that the prisoner is engaging in the conduct the rule is designed to prevent.*

680 F.Supp. at 276 (emphasis supplied). *See also Finney v. Arkansas Board of Correction,* 505 F.2d 194, 207–08 (8th Cir. 1974) (remanding question whether a diet of "grue", a tasteless, pasty substance, was unconstitutional as deprivation of basic necessity of human existence, district court on remand concluding that steady diet of grue was unconstitutional, *Finney v. Hutto,* 410 F.Supp. 251, 276 (E.D.Ark.1976)).

This case fits squarely into the distinctions set up in *Michigan.* As I have indicated, Nutraloaf is being used for punishment.[7] Plaintiff has been placed on controlled feeding status for up to seven days, when there was no record of continuing destructive behavior involving the use of food or utensils. Plaintiff and other inmates have been put on Nutraloaf for misconduct that the controlled feeding rule is not designed to prevent, or which a Nutraloaf diet simply cannot prevent.

If an inmate assaults people with food and utensils, taking away food and utensils is a valid safety measure for so long as the assaultive behavior lasts. That logic does not extend to taking away food and utensils for seven days when the assaultive behavior stops promptly. Nor does it extend to taking away food and utensils for misconduct not related to the misuse of food and utensils, such as spitting or urinating. Even spitting food cannot be prevented by Nutraloaf, because inmates can spit Nutraloaf as easily as anything else. The use of Nutraloaf cannot prevent inmates from throwing materials at others, because they use their hands for that purpose.

When an inmate misuses food or utensils to create a dangerous condition, the temporary use of Nutraloaf as a safety measure, for so long as necessary, has a legitimate penological justification and is not cruel and unusual punishment. Extending controlled feeding after misconduct has ceased or for conduct that could continue even with Nutraloaf lacks a legitimate penological justification, is punitive. Under these circumstances, the use of Nutraloaf causes pain and suffering and lacks legitimate penological justification. I find this practice unconstitutional under the eighth amendment.

### B. *Fourteenth Amendment*

██ I also find that the use of Nutraloaf under some circumstances violates plaintiff's due process rights. The OSP rules authorize controlled feeding orders without a prior hearing, to "reduce the use of food, eating utensils and human waste as weapons." OAR 291–83–005(2). On their face, the rules restrict the discretion of prison staff to impose Nutraloaf and to keep an inmate on a Nutraloaf diet. The rules expressly state that food is not to be used as punishment. In addition, not all prisoners are fed Nutraloaf. Therefore, the controlled feeding regulations confers on plaintiff a liberty interest in a normal prison diet, by specifying the misconduct for which Nutraloaf may be imposed and by establishing the circumstances under which it may continue. *See Michigan,* 680 F.Supp. at 276–77.

Given a liberty interest at stake, in determining what process is due, I must consider the balance between the governmental interest and the private interests, and the risk of an erroneous deprivation. I find the governmental interest in security and safety to be substantial. However, in circumstances where the use of Nutraloaf is merely punitive because it has no rational connection to the misconduct it is intended to curb, I place little weight on the governmental interest.

On the other hand, the plaintiff's interest in a normal prison diet is strong. Pro-

---

**7.** In describing controlled feeding status, defendant explained that there is a seven day limit on the use of Nutraloaf so that it will not be used as "punishment", because punishment is not permitted, only "behavior control" is. Defendant offered no explanation why seven days is a time before which Nutraloaf is behavior control, and after which it is punishment. I cannot think of one.

longed controlled feeding causes substantial suffering, particularly in the DSU setting, where some semblance of a normal diet may be more important than in another environment. Further, in a hostile, explosive environment, there is a high likelihood of an erroneous deprivation.

I agree with the court in *Michigan,* that where the use of Nutraloaf is a temporary, emergency safety measure, due process does not require a prior hearing, because the deprivation is temporary, the governmental interest in immediately curbing violence is strong, and there is minimal opportunity for an erroneous or serious deprivation. 680 F.Supp. at 279. However, the use of controlled feeding orders for misconduct not directly related to the misuse of food or utensils, and which cannot be curbed by the use of Nutraloaf, is a due process violation.

## V. Quiet Cells

### A. *Steel Doors*

■ Plaintiff and other inmates testified that when they are in the quiet cells, they cannot summon guards to assist them. They contend that closed double steel doors between the quiet cells and the DSU staff office make it difficult, if not impossible for the guards to hear them. Andrews disputed this. Based on my observations of the quiet cells, the steel doors, and the location of the DSU office, I accept plaintiff's testimony.

In *Hoptowit v. Ray,* the Ninth Circuit said that "[p]rison officials show deliberate indifference to serious medical needs if prisoners are unable to make their problems known to the medical staff". 682 F.2d at 1253; *see also Balla v. Idaho State Bd. of Corrections,* 595 F.Supp. 1558, 1576 (D.Idaho 1984). It is undisputed that inmates with serious medical needs have been placed in quiet cells for extended periods.[8] Plaintiff has a history of epilepsy, hypertension, and vertigo. He is being treated for depression. These are serious medical needs which could require immediate attention.

There is a legitimate justification for separating noisy, disruptive inmates from the rest of the DSU. However, there is no legitimate justification for isolating those inmates from the DSU staff so completely that they cannot summon the staff for assistance. It is unconstitutional.

### B. *Twenty-four Hour per Day Lighting*

■ It is undisputed that the lights in the quiet cells remain on continuously. Plaintiff and other inmates testified that the continuous illumination disturbs their sleep and causes other psychological effects. Plaintiff's expert psychiatrist, Dr. Rundle, testified that continuous, long-term confinement in quiet cells itself can cause psychotic symptoms and aggravate pre-existing mental disorders. He testified that in addition to this harmful effect, lighting the quiet cells 24 hours a day makes sleep difficult and exacerbates the harm. I accept the testimony of plaintiff and Dr. Rundle.

Defendant justified the constant illumination in the quiet cells as a security measure, so DSU staff could see into the cells. In the abstract, this is a legitimate penological justification. However, there is no evidence that DSU staff needs to see into the quiet cells for 24 hours per day, or that they are even near the quiet cells for 24 hours per day. Defendant offered no reason why the cells could not have switches outside so guards can see into them when they must.

There is no legitimate penological justification for requiring plaintiff to suffer physical and psychological harm by living in constant illumination. This practice is unconstitutional.

## VI. Strip Status

Defendant's repetition of the phrase "there is no such thing as strip status", Tr.

---

**8.** Inmate Chad Hoehne was in the late stages of AIDS at the time of trial. He testified by witness statement that he was kept in a quiet cell behind double steel doors, and was too weak to summon guards for assistance. I take judicial notice of media accounts of Inmate Hoehne's death shortly after trial.

at 118–20, cannot make strip status disappear. Defendant refers to this claim as the "skin search" claim, apparently suggesting that the issue is whether he can strip and search inmates prior to moving them or placing them in quiet cells.

It has been clear from the start of this action that the validity of skin searches is not in dispute. The issue is strip status. Strip status means: 1) stripping an inmate of clothing, bedding and all other property, including items such as toilet paper and writing materials; 2) leaving him stripped in the cell for an extended period; while 3) forcing him to "earn back" the items by demonstrating good behavior; 4) to be determined at the discretion of the staff.

The evidence is clear and convincing that strip status is used in the DSU. Plaintiff and other inmates' testimony that they have been stripped in their cells and left there for extended periods without clothing, bedding, or the most basic of property, such as toilet paper, was uncontroverted and unimpeached. I accept this testimony and plaintiff's testimony that he is unable to keep warm while unclothed in his cell. During my tour of the DSU, I was not only fully clothed and moving, but wearing a coat. I noted that the DSU was cold and damp.

Plaintiff testified that to get his clothing and property returned on strip status, he must demonstrate good behavior to the guards on duty. When he does, he gets the items returned piece-by-piece, solely at the discretion of the guard. Defendant contends that DSU records refute plaintiff's testimony that property must be "earned back" from the guards. I find nothing in the record that refutes this testimony, though there is some evidence of instances where property and clothing were promptly returned. I accept plaintiff's testimony.

The defense to the strip status claim appears to be denial that strip status exists. In response to a question whether taking away clothing and linens is called "strip status" defense witness Armenakis, testified:

A. That's what we call controlling behavior.

Q. You don't use the term strip status?

A. No.

Q. You have never used that term?

A. No.

Q. Are you aware of other guards using that term?

A. Not to my knowledge.

Q. If an inmate who has not been misusing his underwear or undershorts has that item of clothing removed from him, would that be within the current policies and practices of DSU?

A. I don't understand your question.

Q. ... An inmate may not lose his undershorts unless he's misusing those undershorts, it that right?

A. Or he's uncooperative, meaning we are not going to fight somebody to put on clothing. That's another way.

Tr. at 132, line 9, 133 line 1.

On cross-examination, defense witness Andrews was asked whether inmates had complained about being placed on strip status. He responded "[w]e don't have strip status in DSU". Tr. at 142, line 20. He admitted that inmates are kept without clothing for a period of time "if it's connected to behavior." *Id.*, line 23. Defense witnesses testified that DSU guards remove clothing, bedding, and other belongings from an inmate only when the inmate misuses them, and they return those items promptly when the inmate's behavior stabilizes.

Defendant's assertion that "[t]here is no such thing as strip status" is belied by his own records. Evidence clearly shows that strip status exists and is used in response to misbehavior not related to misuse of clothing.

DSU logs and records include numerous references to "strip status". A November 12, 1988 memo to Armenakis, says that Inmate Crocker "was then moved to DS 111 on strip cell status." Exh. 28. An October 26, 1988 memo to defendant from a DSU staff person said "At 4:18 P.M. the inmate was placed in his cell in bellychain and leg restraints on strip cell status...."

Exh. 26. A January 21, 1989 interoffice memo to Armenakis says that "inmate Hoehne was taken back to cell 115 on strip status." Exh. 27.

DSU logs also show that DSU staff has removed all clothing, bedding, and belongings from inmates for reasons other than misuse of those items. The DSU Unusual Incident Log for December 17, 1987 shows that on the first shift, Inmate Boyd refused his meal and spat at staff. On the second shift, without comment about misuse of clothing, bedding, or property, the log says that "Inmate Boyd, D. had his cell and himself stripped." Exh. 6. A December 22, 1987 entry in the same log says that inmate Odds threw water on staff, and "was stripped & placed on C.S.T. status."[9] *Id.* The June 3, 1988 Unusual Incident Log shows that plaintiff was "moved to 115. Throwing water.... Property removed per Armenakis." *Id.* A November 9, 1988 interoffice memo to defendant from a DSU staff member reported that plaintiff had thrown feces, and was "stripped and placed back in cell 107." Exh. 30.

Inmate McPhail testified that he was placed on strip status several times for throwing feces at staff. Inmate Hoehne testified that he was stripped because his cell was dirty. Plaintiff testified that when he is placed in a "quiet cell" his clothing is taken, and there is no bedding, toilet paper, or other property in the cell. He is required to "earn" these items back by good behavior, and the guards alone decide when to return them. Plaintiff has been in a quiet cell without bedding or clothing for up to three days, when the DSU records do not show that he was misusing his clothing or bedding.

DSU records also show that clothing and bedding are not always immediately returned to inmates. DSU log entries for October 6 through October 11, 1988 show that at 3:53 p.m. on the second shift[10] of October 6, an inmate spit on a guard and was moved to a quiet cell. On the third

shift of that day, a blanket and jumpsuit were issued to that inmate. The following day, October 7, on the second shift, that inmate was issued a mattress and supplies at 12:25 p.m. The day after that, October 8, on the first shift, the inmate received sheets and a blanket. Three days later, on October 11, he received his personal property. Exh. 7.

DSU log entries show that on the third shift of November 16, plaintiff attempted to spit at DSU staff, and was rattling his restraints in cell 101. The DSU logs notes that at 12:30 p.m. on the first shift of November 17, plaintiff was loudly rattling his bars, saying all he wanted was a blanket. The log shows the DSU staff response to plaintiff's request for a blanket was "to quiet down and on the next walk maybe he'll get a blanket. At approx. 1:15 this writer gave inmate LeMaire a blanket." Exh. 7.

There is also persuasive evidence that strip status inflicts physical pain. Plaintiff and other inmates testified that they cannot stay warm strip status, and had to sleep on concrete slabs. Inmate McPhail attempted to cover himself with toilet paper to keep warm. Inmate Rushin tried to keep warm by running hot water in his sink and standing over it. Dr. Rundle testified that the use of strip status is degrading and causes psychological harm. I accept this testimony.

The defense presented testimony that the DSU is mechanically maintained at a temperature of 72 degrees. Such a heating system would certainly be unique. Neither is it consistent with my own observations of the DSU, or the testimony of the inmate witnesses.

Defendant's response to the evidence on strip status was that DSU staff are not permitted to punish inmates, there is no such thing as strip status, and DSU disciplinary measures are behavior control, not punishment. Andrews testified that in-

---

**9.** Andrews testified that "C.S.T." might mean close supervision tier.

**10.** Andrews testified that the first shift runs from midnight until 8:00 a.m., the second shift

runs from 8:00 a.m. until 4:00 p.m. and the third shift runs from 4:00 p.m. until midnight. Tr. at 140.

mates should get their property back within eight to sixteen hours after it is taken, but might have to wait for a delivery of supplies. Nevertheless, in response to a request for admission, defendant admitted that officials at OSP use "strip status" to control behavior in the DSU "whereby inmates are deprived of their bedding and clothing and other items of personal property and must earn those items back by maintaining their good behavior". Exh. 4 at 1–2.

Andrews testified that failing to return plaintiff's property and leaving him in restraints in his cell without underwear or clothing was an oversight, and that such oversights had happened before. Andrews said he talked to the DSU staff involved about a particular incident, but took no formal disciplinary action, because that is not his practice. I have already noted the lack of evidence of disciplinary action or of any serious discussion with staff about the incident. Andrews also testified that there is not always adequate staff or supplies to return items immediately.

 There is also ample evidence on the record showing that strip status is used as punishment for behavior not connected to the misuse of clothing or property. Plaintiff and other inmates testified that they were stripped for throwing feces at DSU staff. While throwing feces is certainly misconduct, it does not involve the misuse of clothing and cannot be prevented by confiscating clothing.

Strip status exists in the DSU. It causes physical and psychological pain.[11] Because inmates misuse clothing, bedding and other property to assault others, injure themselves, and damage property, there can be a legitimate penological justification for temporarily removing those items from inmates for safety reasons. Therefore, I do not find the removal of clothing, bedding and other property from inmates unconstitutional *per se.*

However, there is adequate penological justification for stripping inmates when and for so long as a misuse of clothing and property presents a serious risk to personal safety or of property damage. Otherwise, it lacks a legitimate penological justification and is unconstitutional.

## VII. Exercise and Opportunity for Exposure to the Outdoors

Each condition of confinement must be individually analyzed, rather than the "totality of the circumstances". However, the condition must be viewed in the context of a prison environment, "especially when the ill-effects of the particular conditions may be the result of several contributing factors." *Wright v. Rushen,* 642 F.2d at 1133.

Inmates have no choice but to rely on prison officials to provide for their medical needs. *Estelle v. Gamble,* 429 U.S. at 103, 97 S.Ct. at 290. Similarly, in this case, plaintiff is at the mercy of prison officials to decide when, how and where he can exercise. Therefore, I consider whether plaintiff's exercise conditions are cruel and unusual, and find that they are in light of the severe restrictions placed on him under DSU conditions.

I do not trivialize the management problems associated with taking DSU inmates in and out of their cells and offering them exercise opportunities. DSU inmates are violent and dangerous not only to staff, but to each other. To simply let them out in an exercise yard in groups could make defendant vulnerable to charges of deliberate indifference to the personal safety of inmates. *See Capps v. Atiyeh,* 559 F.Supp. 894, 903 (D.Or.1982) (inmates have a right to be "protected from constant threats of assaults from other inmates").

However, violent people do not lose their eighth amendment rights, and as the *Spain* court noted, the "cost or inconvenience of providing adequate facilities is not a de-

**11.** The use of in-cell restraints in combination with strip status is particularly barbaric. Where an inmate has no property with which to cause harm, there is no legitimate reason for the use of in-cell restraints, especially without medical attention and monitoring to ensure that inmates are not needlessly suffering. Such restraints require inmates to eat and drink like animals and prevent them even from wiping after defecating.

fense to the imposition of a cruel punishment." 600 F.2d at 200. Further, although the cost and inconvenience of providing inmates adequate exercise may be high, it may not be so high as the cost and inconvenience of not doing so. People who live in a hostile environment, locked in crowded cells for almost 24 hours per day, seven days per week for years, without vigorous exercise or constructive activities, are likely to exhibit violent, explosive behavior.

The evidence clearly shows the inadequacy of opportunity for regular, vigorous exercise in the DSU, for a number of reasons. Plaintiff has tried to run in place in his cell wearing shower thongs, but pounding on the concrete floor made his feet, ankles and knees hurt, and his legs swelled. Inmates testified, and defendant's evidence confirmed, that if inmates place their mattresses or blankets on the floor, the DSU guards order them to take them off the floor and the inmates can be sanctioned for misuse of property. Inmates are also reluctant to soil their bedding by putting it on the floor, because they can get clean bedding only at designated times. Double-celled inmates have even more trouble exercising because it requires the cooperation of cellmates.

Plaintiff testified that when he has tried to exercise in his cell, he could not maintain his personal hygiene because he got sweaty and was not permitted to shower or change clothes. He said his towel became moldy because it would not dry, and he had to use it that way for several days.

Plaintiff and other inmates testified to a variety of physical and mental problems from extended periods without vigorous exercise—weight gain, elevated cholesterol count, muscle cramps, disorientation, anxiety, sluggishness, and general deterioration. This testimony was credible and uncontroverted.[12]

There is no dispute among the experts on both sides that vigorous aerobic exercise [13] is an important factor in maintaining healthy weight and cardiovascular strength, and reducing a variety of health risks. The primary dispute is whether plaintiff, on LEP status, can get adequate exercise in his cell to prevent physical and mental deterioration. I conclude that he cannot. Defendant's evidence supports this conclusion.

Defendant played a videotape to demonstrate that inmates can get adequate exercise in their cells without special equipment. Exh. 117. The person demonstrating the exercises is a relatively young man, not overweight, who appears healthy and physically fit. He is wearing pants, shirt, and shower thongs. He is in a single-bunked DSU cell. The tape shows no obvious sign of overflow from the toilet on the cell floor.

The demonstration consists of a few minutes of several different exercises such as squats, lunges, push-ups, wall slides and sit-ups. It is obvious from the nature of the exercises that some instruction is required to perform them properly. When the demonstrator placed a blanket on the cell floor and attempted to run in place on it, he had trouble keeping his shower thongs on his feet, the blanket slipped from under his feet and he appeared to lose his balance.

Dr. Malcolm Snider, a practicing orthopedic surgeon specializing in sports medicine, testified as an expert for plaintiff. He discussed the adequacy and safety of in-cell exercise opportunities based on two considerations, the floor surface in the DSU cells and footwear. Dr. Snider concluded DSU

---

**12.** OSP Nurse Collatt testified that plaintiff has no serious health problems and she found nothing in plaintiff's medical records showing complaints or requests for treatment for weight gain. Even if this testimony did controvert plaintiff's testimony, which it does not, I have already commented on the reliability of inmate medical records. *See,* n. 4 above. Further, plaintiff need not show a serious medical condition resulting from lack of exercise opportunities. He must only show physical and or mental deterioration or lack of conditions necessary to insure good physical and mental health. *See, Spain v. Procunier,* 600 F.2d at 200.

**13.** Dr. Snider testified that an "aerobic" level of exercise means exercise vigorous enough to elevate the heart rate and maintain the elevated rate for at least 20 minutes. Tr. at 48.

inmates cannot safely exercise vigorously enough in their cells to remain healthy. He also concluded that the outdoor cubicles were inadequate without exercise equipment, because of the hard concrete floor and lack of adequate footwear.

On cross-examination, Dr. Snider testified that he was aware of low and non-impact aerobic exercise as a way to avoid pounding on the feet. While he agreed that this exercise could be done in a space the size of a DSU cell, he did not agree it could be done effectively in a DSU cell in shower thongs. Dr. Snider testified that even low-impact or non-impact aerobic exercise could harm the feet, knees, and ankles, if done without appropriate footwear or other shock absorption protection. After watching defendant's videotape, Dr. Snider reached the obvious conclusion that running in place on a blanket on a DSU cell floor is unsafe. Also, his opinion is that the blanket does not provide adequate shock absorption.

Dr. Linn Goldberg testified as an expert witness for defendant. He is an internist with a practice that includes the medical aspects of exercise. Dr. Goldberg concluded that the DSU cell size would not prevent activities sufficient to maintain or improve overall fitness.

Dr. Goldberg said he would ordinarily conduct a medical examination before recommending an exercise program to a sedentary person, but would "not necessarily" recommend exercising in bare feet. He concluded that a person can improve aerobic fitness with non-impact aerobic exercises, and that no special footwear is needed for that type of exercise. Dr. Goldberg used the videotape as an example of non-impact aerobics he would propose. On cross-examination, he admitted that the demonstrator did not exercise for a sustained 20 minute period, and no heart rate measurement was taken to determine whether he had achieved an adequate aerobic level of activity.

Plaintiff also presented persuasive, uncontroverted evidence of the negative psychological effects of lack of exercise. Dr. Colbach, an OSP staff psychiatrist, testified about plaintiff's individual psychological condition and concluded that he does not have a "major depression". Dr. Colbach did not address the psychological effects of the exercise conditions in the DSU. Dr. Colbach's failure to diagnose major depression does not mean that plaintiff's exercise conditions are not psychologically harmful. Plaintiff should not have to wait until he is psychotic to claim that they are.

Dr. Rundle testified as an expert for plaintiff on the psychological effects of the DSU exercise conditions.[14] He testified that DSU inmates can suffer serious psychological harm from the lack of adequate exercise opportunities. Dr. Rundle believes the harmful effects of lack of exercise begin immediately, but most people will begin to deteriorate within a few days after being deprived of sunlight, fresh air, and exercise. After three to four weeks in such conditions, most people will suffer physical and psychological harm, which may be irreversible or slow to remit. Dr. Rundle also observed that confinement under the conditions in the DSU leads to a buildup of tension that often results in painful contractions of large muscles, which would in most cases be relieved by regular, vigorous exercise.

Dr. Rundle testified that when the normal means of discharging accumulated tension through exercise is not available in prison, inmates often express this tension with physical violence and aimless destruc-

**14.** Dr. Rundle is a psychiatrist, specializing in institutional psychiatry. He has practiced at public mental hospitals, private community hospitals, drug addiction treatment programs, and correctional institutions. He has advised a state legislature, held administrative positions in corrections programs, and served as a court-appointed advisor and monitor in two federal prison litigation actions. The psychological impact of lack of adequate exercise in prisons is a significant part of his work as an expert witness.

There is no dispute about the qualifications of any expert witness in this case. I mention Dr. Rundle's qualifications specifically, not as a comparison to the those of the other highly qualified expert witnesses, but because of their direct relevance to the issues in this action.

tion of property.[15] The lack of exercise is also a potent factor in developing and exacerbating depression. This effect is enhanced by the lack of time out of the cell and lack of interaction with others.

Dr. Rundle characterizes the importance of outdoor exercise to prison populations as "universally accepted" by health care and correctional experts. Defendant did not cross-examine Dr. Rundle on this point and did not controvert this testimony. Dr. Rundle noted that standards developed by the American Correctional Association and the American Medical Association for prisons include regular outdoor exercise.

Dr. Rundle concluded that it is impossible to get adequate exercise in a DSU cell under the current conditions, not only because of physical limitations, but because of psychological barriers. He said that someone confined in the DSU for extended periods, with minimal sensory stimulation, and no control over his life would normally have extreme difficulty maintaining the discipline necessary for an adequate exercise program.

The exercise conditions in the DSU are unconstitutional as a deliberate indifference to serious medical needs. I accept plaintiff's testimony that his mental and physical condition has deteriorated from lack of adequate exercise. The experts on both sides agree that regular, vigorous exercise is necessary for good physical and mental health of inmates. Courts accept this proposition. *See Toussaint v. McCarthy*, 597 F.Supp 1388, 1393 (N.D.Cal.1984), *aff'd in part, rev'd in part and remanded*, 801 F.2d 1080 (9th Cir.1986) (citing *Spain* and *Martino*, other citations omitted).

Numerous courts have found that the complete, long-term denial of fresh air, regular exercise and recreation to inmates is unconstitutional. In *Spain*, 600 F.2d at 199–200, the Ninth Circuit found it cruel and unusual to deny segregation inmates the opportunity for regular outdoor exercise, when those inmates had been segregated for more than four years. The Circuit affirmed the district court decision, which was based on several factual considerations: 1) the inmates spent virtually 24 hours every day in their cells; 2) their contact with other prisoners was minimal; 3) the inmates lived in "an atmosphere of fear and apprehension and are confined under degrading conditions without affirmative programs of training or rehabilitation and without possible rewards or incentives from the state which will give them a semblance of hope for their transfer out of ... [segregation]". *Spain*, at 199 (quoting district court opinion at 408 F.Supp 545.) The Circuit also noted that it was not ruling that a denial of regular outdoor exercise is unconstitutional per se, but found such a denial unconstitutional for inmates held for more than four years. *Id.*[16]

The *Spain* court reviewed the caselaw concerning outdoor exercise for inmates, and found substantial agreement that some form of regular outdoor exercise is extremely important to their psychological and physical well-being. *Id.* at 199. The court relied on the principal that current and enlightened scientific opinion about conditions necessary to insure good physical and mental health should guide a court, and found that the district court gave proper consideration to this principal. *Id.* at 200.

Similarly, in *Martino v. Carey*, 563 F.Supp 984, 1001 (D.Or.1983), Judge Redden held that it was unconstitutional to deprive jail prisoners of outdoor exercise, where they were locked down in their cells, the cells were too small for calisthenics, the cell floors were often contaminated from overflowing toilets, and experts testified that the denial and all outdoor exercise endangered the mental and physical health of prisoners.

---

**15.** Dr. Rundle also testified about the psychological stresses and harm to the DSU staff due to their working conditions. He emphasized the need for proper retraining of staff so that they have appropriate, controlled responses to the types of risk and stresses they face.

**16.** In dicta, the court noted its concurrence with the district court's observation that it would serve a useful purpose if the state of California would "reexamine its exercise policy as to all persons" in segregation. *Id.* at 199.

*Spain* and *Martino* are well-reasoned, factually on point, still good law, and controlling in this district. In *Martino*, Judge Redden described cases holding that the denial of exercise violates the eighth amendment as "legion". 563 F.Supp. at 1001. After *Martino*, a California district court said, "it is settled that prisoners may not be deprived of all exercise, because some form of regular outdoor exercise is extremely important to the psychological and physical well-being of the inmates." *Toussaint v. McCarthy*, 597 F.Supp. at 1393.

Both *Spain* and *Martino* declined to draw lines between permissible and impermissibly long denials of exercise and opportunities to go outdoors. I decline to do so as well, because it is unnecessary in this case. The denial here is clearly unconstitutional. Plaintiff's term in the DSU, as of the trial date, is five years. His LEP status will last almost that long. This is far longer than the inmates in both *Spain* and *Martino* were denied exercise and exposure to the outdoors, and the conditions of his confinement are factually almost identical. The expert witnesses agree that exercise is necessary for good health. They disagree whether plaintiff can get adequate exercise in his cell. Based on the evidence in the record, I am persuaded that constitutionally adequate exercise is not possible for plaintiff in his cell.

Plaintiff is deprived of outdoor exposure and exercise opportunities adequate to prevent physical and mental deterioration. This is unconstitutional.

### REMEDY

I take seriously the Supreme Court's admonition about undue judicial interference with the operations of prisons. *Bell v. Wolfish*, 441 U.S. at 562, 99 S.Ct. at 1886. Judges are perhaps the least qualified to fashion remedies of all participants in this type of litigation. Based on my observations throughout this case, I am confident that under the guidelines I have set forth counsel, the parties, and their experts can either jointly fashion an appropriate remedial order, or agree upon a procedure for doing so. I also believe they should do so because an order resulting from a process in which the parties have participated will be more effective and workable in the long-run than one unilaterally imposed.

Therefore, counsel should confer and provide me with a written status report within 45 days of this opinion. If the parties are unable to reach an agreement on the appropriate remedy or develop a process for reaching an agreement, I will not hesitate to fashion any remedy necessary and monitor it to any degree necessary to ensure that plaintiff is afforded his rights. By participating in the development of a remedy and reaching an agreement based on this opinion, defendant does not waive his right to appeal.

### CONCLUSION

Defendant has violated plaintiff's constitutional rights to due process and freedom from cruel and unusual punishment. I find for plaintiff and conclude that he is entitled to permanent injunctive relief.